**PORT COOPER/T. SMITH STE-VEDORING COMPANY, INC., Petitioner,**

v.

**Willard HUNTER, Respondent.**

No. 99–60599.

United States Court of Appeals, Fifth Circuit.

Sept. 21, 2000.

Michael D. Williams, Kenneth G. Engerrand (argued), Brown, Sims, Wise & White, Houston, TX, for Petitioner.

Gary B. Pitts (argued), Pitts & Collard, Houston, TX, for Hunter.

Before WIENER and STEWART, Circuit Judges, and LITTLE *, District Judge.

CARL E. STEWART, Circuit Judge:

Before us is an appeal from a decision by an Administrative Law Judge ("ALJ"), pursuant to a claim under the Longshore and Harbor Workers' Compensation Act, affirmed by the Benefits Review Board ("BRB"). The self-insured employer in this case, Port–Cooper/T.Smith Stevedoring ("Port Cooper"), takes the position that

---

* District judge of the Western District of Louisiana, sitting by designation.

it is impossible that the injury suffered by Willard Hunter ("Hunter") occurred as alleged. After a thorough review of the record in this case, we affirm, finding that the evidence supports the ALJ's findings.

## FACTUAL AND PROCEDURAL BACKGROUND

Willard Hunter filed a claim for benefits as a result of an accident allegedly occurring on April 5, 1997, where his shoulder was injured when the steering wheel of a forklift he was operating "kicked back," catching his hand and arm. The longshoremen witnesses in this case describe a "kick back" as occurring when a driver picks up a heavy load, and then runs over an object in his way. The wheels on the forklift lock up and the steering wheel spins out of control. Hunter continued working after the incident but within two hours reported to the foreman and superintendent that his arm was giving him pain and was very stiff. After going to the hospital, Hunter received medical attention and an orthopedic doctor diagnosed him with a torn ligament in his left shoulder. The claim was controverted by Port Cooper April 17, 1997, and no disability benefits were paid.

A formal hearing was held March 30, 1998 before an ALJ, the principal issues being whether Hunter suffered an injury April 5, 1997 in the course of his employment with Port Cooper, and the nature and extent of any disability sustained. On June 22, 1998, the ALJ issued a decision and order awarding benefits to Hunter. On July 4, 1999 the BRB affirmed the ALJ's decision and order. Port Cooper timely filed notice of appeal to this court.

## DISCUSSION

The Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 ("LHWCA" or "the Act") requires the BRB to accept the findings of the ALJ "unless they are not supported by substantial evidence in the record considered as a whole or unless they are irrational." *Mijangos v. Avondale Shipyards,*

*Inc.,* 948 F.2d 941, 944 (5th Cir.1991)(citing 33 U.S.C. § 921(b)(3)). The BRB does not have the statutory authority "to engage in a *de novo* review of the evidence or to substitute its views for those of the ALJ." *Mijangos,* 948 F.2d at 944 (5th Cir.1991). Therefore, our review of BRB decisions is limited to considering errors of law and ensuring that the Board adhered to its statutory standard of review, that is, whether the ALJ's findings of fact are supported by substantial evidence and are consistent with the law. *See Sisson v. Davis & Sons,* 131 F.3d 555, 557 (5th Cir.1998)(internal citation omitted). "[W]e may not substitute [our] judgment for that of the ALJ, nor may we reweigh or reappraise the evidence, instead we inquire whether there was evidence supporting the ALJ's factual findings." *Boland Marine & Manufacturing Co. v. Rihner,* 41 F.3d 997, 1002 (5th Cir.1995) (quoting *Empire United Stevedores v. Gatlin,* 936 F.2d 819, 822 (5th Cir.1991)).

Section 920 of the LHWCA states, "[I]t shall be presumed, in the absence of substantial evidence to the contrary—(a) That a claim comes within the provisions ..." of the Act. Thus, inherent in this provision is the presumption that an injury is causally related to a worker's employment. *See Gooden v. DOWC,* 135 F.3d 1066, 1068 (5th Cir.1998) In order for that presumption to apply, the claimant must make a *prima facie* showing of causation. *Id.* To invoke the Section 920(a) presumption, a claimant must prove (1) that he or she suffered harm, and (2) that conditions existed at work, or an accident occurred at work, that could have caused, aggravated, or accelerated the condition. *See Conoco, Inc., v. DOWC,* 194 F.3d 684, 687 (5th Cir.1999).

There is no dispute between the parties that Willard Hunter suffered an injury to his left shoulder. Mr. Hunter, a forty-six-year-old man who had been a longshoreman for twenty-six years, testified that between nine and ten o'clock on

the Saturday morning of April 5, 1997 he was unloading steel pipes with a forklift on a dock filled with wooden dunnage. Maneuvering on the dock, he turned the steering wheel of the forklift to one extreme, reversed, and the gears began to grind. Attempting to accelerate, he "mashed" the gas and hit several pieces of dunnage causing them to spew about. Hunter testified that at that point, the steering wheel spun violently out of control, catching his left arm and jerking his shoulder. Hunter continued to work, although by noon he stopped because his shoulder was sore and stiff. He reported the accident to the foreman of his shift and Port Cooper's superintendent. Hunter left work and went to Memorial Hospital where his treating nurse initially noted that his left shoulder was immobilized. Hunter's shoulder was x-rayed and examined by an orthopedic specialist, Dr. B.T. Wright ("Dr.Wright"), who diagnosed him with left A/C separation, or a torn ligament. Dr. Wright causally related Hunter's injury to the work accident and noted that it was medically necessary for Hunter to have time off. Based on this evidence we find a *prima facie* showing that an accident which could have caused Hunter's torn ligament occurred at Port Cooper.

■ Once a *prima facie* case is established and the presumption is invoked, the burden shifts to the employer to rebut it. *See Hampton v. Bethlehem Steel Corp.*, 24 BRBS 141, 144 (1990). The presumption can be rebutted by "substantial evidence to the contrary[.]" 33 U.S.C. §§ 920(a). A presumption can be rebutted by an employer through substantial evidence establishing the absence of a connection between the injury and the employ-

ment. *See Gooden,* 135 F.3d at 1068. If the employer rebuts the presumption, then the issue of causation must be decided by looking at all of the evidence in the record. *Id.*

■ The crux of Port Cooper's appeal begins with the assertion that at the time of the alleged incident, Hunter was operating a forklift with a hydraulic, not manual steering system. Through the expert testimony of Dr. James Ziegler, a biomedical and mechanical engineer, Port Cooper avers an absolute; it "would be against the laws of physics" for a hydraulicly operated forklift to produce a kick back effect. Dr. Ziegler testified that with a hydraulic steering mechanism there is no direct mechanical link between the steering wheel and the wheels, thus impact to the wheels can not affect the steering wheel.[1] Port Cooper maintains that the ALJ and BRB erred in finding that Port Cooper failed to present substantial evidence to rebut the presumption that Hunter's injury was caused by a kick back because this was a physical impossibility if Hunter was operating a hydraulic steering system.

Although the record does not prove to a certainty that hydraulic steering forklifts are incapable of kick back, the conclusion Port Cooper advances is of no consequence because the relevant question for our analysis is what type of forklift Hunter was operating at the time of the alleged accident. That question is left unanswered by the record before us. This fact which is critical to Port Cooper's argument, could have been easily established if employer records about which forklifts were used at each ship were introduced into evidence.

---

1. Specifically, Dr. Ziegler explained that the steering tires of a hydraulic forklift are controlled through a hydraulic actuation system, not a direct mechanical link. In a steering mechanism on a hydraulic forklift, the wheel is connected to a series of pressurized valves which direct fluid to control the hydraulic rams at the wheels. As pressure increases, the plate at the hydraulic ram is directed which steers the forklift. Dr. Ziegler stated that kick back could not occur because the force applied to the wheel could not reverse up the system to the steering wheel.

In response to the question of whether it was "impossible for hydraulic steering to have a kick back" Dr. Ziegler adjusted his testimony and indicated that it was possible to have kick back with a tiny hydraulic system, or with one moving at very slow speed.

These records were not introduced to the ALJ and thus are not before this court to review. It is clear from the record, however, that after Hunter reported his injury to his supervisors, the forklift he was operating was not identified or examined. It was not until two days later that the forklift at the dock where Hunter was working was examined by Mr. Rodney Wright ("Mr.Wright"), manager of the crane and gear department at Port Cooper. Although Port Cooper insists that Mr. Wright knew that Hunter was operating a 36,000 pound Hyster forklift, Mr. Wright testified that he sometimes kept a written log in his desk tracking equipment, but did not record the identification number of the forklift Hunter was operating.[2]

None of the testimony Port Cooper put forth establishes which forklift Mr. Hunter was operating at the time of the accident, nor whether the forklift he was operating had hydraulic steering. The record does, however, reveal substantial evidence supporting the ALJ's determination, which is the essence of our circumscribed review.

As the ALJ noted in his order on reconsideration, there was a dispute as to whether Hunter was driving a 36,000 pound or 52,000 pound machine. Port Cooper maintains that Mr. Wright's testimony established that there were no 52,000 pound machines on the dock the day Mr. Hunter was injured, and that of the three forklifts Hunter could have been using, all were fairly recently purchased 36,000 pound machines with hydraulic steering. Mr. Wright testified to these facts while also acknowledging that he had no actual recollection or record of which ship Hunter was working on the day of the accident.

Mr. Hunter himself vacillated in his responses as to which particular machine he was operating on the day of the accident, and was essentially unsure. He simply testified that he was hurt when the machine he was operating struck heavy dunnage and kicked back. Hunter testified that the forklift he was operating looked between 10 and 15 years old and that he did not know what kind of steering mechanism, manual or hydraulic, the machine had.

Even assuming that Hunter was driving a 36,000 lb. forklift with hydraulic steering, it was not conclusively shown by Port Cooper that forklifts with hydraulic steering are incapable of kick back, which is the crux of their position. Hunter submitted the testimony of six longshoremen, all who testified to the frequency of kickback when the wheels of a forklift hit an object of substantial size in the ground. F. Bennett Jr., who has been a longshoreman for forty years testified that even a hydraulic steering forklift, or as he phrased it, a power steering forklift, can occasionally kick back, although they are less likely to produce kickback than manual steering forklifts. Another longshoreman, Ollie Kelley testified that as a safety concern, in his work he looked out for the phenomenon of kick back, even with the newer hydraulic forklifts. Hunter also introduced the deposition testimony of Billy Wise ("Mr. Wise") and William Haynes ("Mr. Haynes"). Mr. Wise, a longshoremen of twenty-three years testified that on one occasion, the 36,000 lb. forklift he was operating for Port Cooper kicked back. Al-

---

2. Mr. Wright also conducted tests, attempting to reenact a kick back effect on a 36,000 pound Hyster forklift, which he conceded may not have been the actual forklift Hunter drove. The tests were conducted without the steel pipes Hunter was lifting because Wright considered it too "dangerous."

Critical variables were also negated when Dr. Ziegler conducted a re-enactment, "when we had one of the operators drive the forklift over a piece of dunnage we laid down." The operator drove over the single piece of dunnage, wheels straight, wheels curved forward and wheels curved backward. No kick back occurred. Mr. Hunter specifically testified that the dock was covered in dunnage when he was injured, and that when his steering wheel spun, large amounts of dunnage dispersed. Thus, neither of these re-enactments tested a forklift in the conditions Mr. Hunter experienced.

though Mr. Wise could not recall precisely whether that machine had hydraulic or manual steering, he testified that although hydraulic machines were less likely to produce kickback, there was the potential to do so with any forklift. Mr. Haynes, a longshoreman for thirty-five years testified that a 36,000 pound hydraulic steering forklift he was operating once kicked back on him. Haynes testified that he had driven every type of forklift on the waterfront and that all of them had a propensity to kick back. Arthur Moore Jr., who has been a longshoreman for forty-one years also testified to that all forklifts can kick back.

Port Cooper argues that it presented overwhelming evidence to rebut the presumption of causation. We disagree. Port Cooper's strongest evidence, that of Mr. Wright, was unsubstantiated. Even the expert testimony of Dr. Ziegler did not negate the possibility of a hydraulicly steered forklift producing kick back, in extreme circumstances such as very slow movement. Hunter's testimony is essentially that his forklift was immobilized by the tunnage, a circumstance that would be consistent with Dr. Ziegler's testimony. The recreations attempted by Port Cooper failed to produce comparative circumstances to those encountered by Hunter. Although Port Cooper's position is plausible, we are not convinced that its evidence was so forceful that it successfully rebutted the presumption of causation. Our review of the record reveals that there was substantial evidence to support the ALJ's determination to award benefits. We find that the BRB correctly concluded that the ALJ's order was supported by substantial evidence based on the record as a whole, and that it was in accordance with the law. AFFIRMED.