**AMERICAN STEVEDORING LIMITED, Petitioner,**

v.

**Victor MARINELLI, Office of Workers' Compensation Programs, U.S. Dept. of Labor, Respondents.**

**Docket No. 00–4180.**

United States Court of Appeals, Second Circuit.

Argued: March 12, 2001.

Decided: April 26, 2001.

Joshua T. Gillelan II, Senior Attorney, Office of the Solicitor of Labor, Division of Employee Benefits, Washington, DC, for Respondent Director, OWCP.

Before SOTOMAYOR and JACOBS, Circuit Judges, and BERTELSMAN, District Judge.*

SOTOMAYOR, Circuit Judge:

Petitioner American Stevedoring Limited ("ASL") appeals from an order of the Benefits Review Board of the United States Department of Labor (the "Board") affirming the decision of an administrative law judge ("ALJ") awarding respondent Victor Marinelli ("Marinelli") permanent total disability compensation under the Longshore and Harbor Workers' Compensation Act ("LHWCA" or the "Act"), 33 U.S.C. § 901 *et seq.* ASL argues on appeal that (i) Marinelli is not entitled to benefits because his shop steward duties did not qualify as "maritime employment"; (ii) ASL is not required to pay such benefits because it was not Marinelli's employer; and (iii) Marinelli failed to establish that he was permanently and totally disabled. Finding each of these arguments to be without merit, we affirm the Board's affirmance of the ALJ's award of permanent total disability compensation to Marinelli.

## BACKGROUND

Prior to 1986 or 1987, Marinelli was employed by ASL's predecessor as a "safety man," that is, a worker whose duty it is to ensure that conditions on the loading terminal are sufficiently safe for stevedoring work.[1] In 1986 or 1987, Marinelli's

Lawrence P. Postal, Seyfarth Shaw, Washington, DC, for Petitioner.

Philip J. Rooney, Israel, Adler, Ronca & Gucciardo, New York, NY, for Respondent Victor Marinelli.

---

* The Honorable William O. Bertelsman, of the United States District Court for the Eastern District of Kentucky, sitting by designation.

1. A stevedore is a "person employed in loading and unloading vessels." Black's Law Dictionary (6th ed. 1990).

employment as a safety man ceased when he was appointed by the International Longshoremen's Association Local 1814 (the "union"), the union representing ASL employees, as its shop steward—a position required by the collective bargaining agreement ("CBA") between ASL and the union. Subsequently, Marinelli was elected to the shop steward position by the union members. Marinelli testified that, as shop steward, he was effectively an arbitrator between ASL's management and the union members. Marinelli had authority under the CBA to enforce work rules specified in the CBA, as well as informal pier rules. Both sides would come to him with complaints. ASL typically complained that the workers were not following the work rules or not working diligently, while the union members generally complained that they were short of men or received insufficient breaks. Sometimes Marinelli sided with management, sometimes with the union members. Marinelli testified that, on occasion, he would order a work stoppage, without the union's permission, if he believed that ASL was requiring union members to work under unsafe conditions.

The CBA required the shop steward to be present on the pier whenever stevedoring work was taking place. In practice, however, loading and unloading took place even when Marinelli was not physically present on the pier, but he had to be available at such times. Marinelli would be paid for every hour stevedoring work was taking place, regardless of whether he was physically present on the pier.

Pursuant to the CBA, ASL paid Marinelli's hourly wages and deducted therefrom amounts for federal and state income tax, social security benefits, and disability benefits. ASL officials testified, however, that they had no control over Marinelli's activities. Marinelli stated that, three or four times a week, he reported to union officials about what was taking place on the pier, but that nobody told him what to do on his job.

On March 16, 1997, after engaging in a dispute with some of the workers, Marinelli experienced chest pain, took several nitroglycerin tablets, and passed out, striking his head as he fell. Marinelli was taken to a hospital where he underwent a cardiac catheterization. Marinelli was discharged on March 18, 1997, and thereafter treated with medication. It is undisputed that Marinelli suffered from pre-existing coronary artery disease, had previously undergone a coronary bypass procedure in 1989, and had been suffering from chest pain for three years before the incident occurred. After March 16, 1997, Marinelli also began treatment for psychological symptoms.

Subsequent to the March 16th incident, Marinelli filed a claim for permanent total disability compensation under the LHWCA, contending that stressful conditions at his place of employment aggravated his underlying heart and psychological conditions. Marinelli's filing of this claim brought the Director of the Office of Workers' Compensation Programs (the "Director"), United States Department of Labor ("OWCP") into the case as an interested party. *See Ingalls Shipbuilding, Inc. v. Director, OWCP (Yates)*, 519 U.S. 248, 262–70, 117 S.Ct. 796, 136 L.Ed.2d 736 (1997).

An initial hearing on Marinelli's LHWCA claim was held on April 23, 1998. In an Interim Decision and Order on Jurisdiction entered June 29, 1998, the ALJ found that an employer-employee relationship existed between ASL and Marinelli. The ALJ further found that Marinelli's shop steward duties were an integral and essential part of ASL's stevedoring business, and therefore held that Marinelli was

a covered maritime employee under Section 2(3) of the Act, 33 U.S.C. § 902(3).

Further hearings on the merits of Marinelli's claim were held on January 12, 1999 and March 16, 1999. In a Decision and Order entered July 13, 1999, the ALJ found that Marinelli's work stress had aggravated his underlying cardiac condition and caused adverse psychiatric consequences, and that Marinelli was unable to return to his usual employment. On the basis of these findings, the ALJ awarded Marinelli permanent total disability compensation under 33 U.S.C. § 908(a), and medical benefits under 33 U.S.C. § 907.

In a Decision and Order dated August 1, 2000, the Board affirmed both ALJ orders. *Marinelli v. American Stevedoring Ltd.*, BRB No. 99–1135, 2000 WL 1133566 (B.R.B. Aug. 1, 2000). ASL timely appealed. We have jurisdiction over this appeal pursuant to 33 U.S.C. § 921(c).

## DISCUSSION

■ Our review of the underlying administrative decisions is of limited scope: "We will only consider whether the [Board] made any errors of law and whether the ALJ's findings of fact, in light of the entire record, are supported by substantial evidence." *Sealand Terminals, Inc. v. Gasparic*, 7 F.3d 321, 323 (2nd Cir.1993). Furthermore, we grant deference to the views of the Director with regard to questions of interpretation of the LHWCA. *Fleischmann v. Director, OWCP*, 137 F.3d 131, 136 (2d Cir.1998).[2]

■ In order to qualify for permanent total disability benefits to be paid by ASL under the LHWCA, Marinelli was re-

quired to demonstrate that (i) he was engaged in "maritime employment," 33 U.S.C. § 902(3); (ii) an employer-employee relationship existed between him and ASL, *id.* §§ 902(2), 902(3), 902(4); (iii) his injury was causally related to his employment, *id.* § 902(2); and (iv) his injury rendered him permanently and totally unable to perform his job, *id.* §§ 902(10), 908(a).

## I. "Maritime Employment"

■ Section 2(3) of the Act defines a covered "employee" as "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder and ship-breaker." 33 U.S.C. § 902(3). An employee is engaged in maritime employment as long as some portion of his job activities constitutes covered employment. *See Northeast Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 275–76, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). Maritime employment is not limited to the occupations specifically enumerated in Section 2(3), but also encompasses any employment that is "an integral or essential part of loading or unloading a vessel." *Chesapeake & Ohio Ry. Co. v. Schwalb*, 493 U.S. 40, 45, 110 S.Ct. 381, 107 L.Ed.2d 278 (1989).

Implicitly invoking *Schwalb*'s "integral or essential" test, the ALJ concluded that Marinelli's performance of his shop steward duties was "an integral part of and essential to [ASL's] maritime business." The ALJ based this conclusion on findings that Marinelli (i) represented the interests of both ASL and the union members, and (ii) "facilitated the day-to-day operation of

---

**2.** ASL contends that, "[w]hile the deference entitlement is generally true, the courts have recognized that a litigation position, which is not contained in regulations, is not entitled to deference." Because, as explained below, we

have no occasion to consider whether the Director's positions in this litigation should be given deference, *see infra* note 3, we do not address ASL's contention.

[ASL's] business so as to remove interpersonal obstacles which might otherwise obstruct such ongoing operations."

The Board affirmed, finding that the ALJ's conclusion was supported by substantial evidence and consistent with numerous state court cases holding that shop stewards and other union officials are entitled to workers' compensation benefits from employers because "they act in the interest of employers as well as unions, as the negotiation and implementation of collective bargaining agreements prevents unrest and promotes the uninterrupted operation of an enterprise." *Marinelli,* 2000 WL 1133566, at *4 n. 5 (collecting cases).

On appeal, ASL argues that Marinelli's claim fails under *Schwalb*'s "integral or essential" test because (i) "non-union longshoring operations do better without a shop steward," (ii) "ships loaded and unloaded even when [Marinelli] was not present," and (iii) Marinelli's "duties were the same as a shop steward in Kansas at a tire plant."[3]

■ The first of these three claims is without merit because the relevant question is whether Marinelli's shop steward duties were integral or essential to *ASL's* stevedoring operations—operations that were carried out by unionized employees—not whether shop steward duties are integral or essential to stevedoring operations *in general.*

■ As for the second and third claims, the Director correctly points out that virtually identical claims were explicitly rejected by the Supreme Court in *Schwalb. Schwalb* concerned railroad employees at

waterfront coal terminals who performed maintenance and repair work on the equipment used to dump coal from rail cars and to convey it from the dumping area to the ships' holds. *Schwalb,* 493 U.S. at 43, 110 S.Ct. 381. The Court held that "employees who are injured while maintaining or repairing equipment essential to the loading or unloading process are covered by the Act." *Id.* at 47, 110 S.Ct. 381. The Court explained that such employees are not

> removed from coverage if they also have duties not integrally connected with the loading or unloading functions.... When machinery breaks down or becomes clogged or fouled because of the lack of cleaning, the loading process stops until the difficulty is cured. *It is irrelevant that an employee's contribution to the loading process is not continuous or that repair or maintenance is not always needed.*

*Id.* (emphasis added). This reasoning applies equally to defeat ASL's second contention that because ships sometimes were loaded and unloaded without Marinelli being physically present, he was not needed. It is irrelevant to Marinelli's claim that his contribution to the loading process was not always needed.

■ The *Schwalb* court also stated that "[i]t makes no difference that the particular kind of repair work [the workers were] doing ... might be done by railroad employees wherever railroad cars are unloaded." *Id.* at 48, 110 S.Ct. 381. This reasoning applies equally to defeat ASL's third claim that Marinelli's work as a shop stew-

---

**3.** Citing legislative history indicating that the Act covers only employees who are "directly involved in the loading and unloading" of cargo, ASL also argues that because Marinelli performed no loading or unloading, he is not covered by the Act. As previously noted, however, the Supreme Court in *Schwalb* has al-

ready interpreted the Act as covering any employee whose tasks are "integral or essential" to the loading and unloading of ships. Hence, we are obliged to employ this "integral or essential" test, rather than ASL's proposed alternative test.

ard was not particular to the stevedoring industry. It makes no difference that the particular kind of shop steward work Marinelli performed might have been performed by a shop steward at a tire plant in Kansas.[4]

In sum, the ALJ's determination that Marinelli was engaged in maritime employment was supported by substantial evidence.[5]

## II. Employer–Employee Relationship

■ For a claim to be compensable under the Act, the injury must arise out of and in the course of employment. 33 U.S.C. § 902(2). Therefore, an employer-employee relationship between the employer and the claimant must exist at the time of the injury. *See Fitzgerald v. Stevedoring Servs. of Am.*, BRB No. 00–0724, 2001 WL 94757, at *4 (B.R.B. Jan. 31, 2001) (en banc) (citing *Clauss v. Washington Post Co.*, 13 B.R.B.S. 525 (1981), *aff'd*, 684 F.2d 1032 (D.C.Cir.1982)). Under the Act, "employee" is defined as "any person engaged in maritime employment," and "employer" is defined as "an employer any of whose employees are employed in mari-

time employment." 33 U.S.C. §§ 902(3), 902(4).

### A. The ALJ's Analysis

The ALJ rested his determination that an employer-employee relationship existed between ASL and Marinelli on two grounds. First, the ALJ noted that ASL was required by the CBA to pay Marinelli's wages. Second, the ALJ reasoned as follows:

> Premise 1: ASL was an employer under the Act because, as a stevedoring company, it employed individuals "employed in maritime employment."
>
> Premise 2: Marinelli was "employed in maritime employment."
>
> Conclusion: Therefore, ASL was Marinelli's employer under the Act.

This reasoning clearly begs the question of who was Marinelli's employer. The ALJ's conclusion follows from the premises only if one assumes that Marinelli's only possible statutory employer was ASL. As ASL points out, however, the union may have been Marinelli's statutory employer. ASL contended that the union was Marinelli's statutory employer because the union—

---

**4.** *Schwalb* also emphasized that "[t]he determinative consideration is that the ship loading process could not continue unless [the equipment on which the employees worked] was operating properly." *Id.* Because the hearing testimony revealed that Marinelli resolved disputes that had the potential to interrupt loading and unloading operations and that Marinelli had the authority to order a work stoppage, the ALJ could have found that "the ship loading process could not continue unless" Marinelli properly performed his duties.

**5.** Although this is also the conclusion urged by the Director, the question of whether we should defer to the Director's position on this issue does not arise because we owe such deference only to positions based on the Director's interpretation of the Act. *Fleischmann*, 137 F.3d at 136. As indicated above,

however, the Director's position on this issue is based on his interpretation of *Schwalb*, rather than on his interpretation of the Act.

On the other hand, the deference question does arise with respect to the Director's alternative argument that Marinelli engaged in maritime employment because he often worked directly on the ships, because this position *is* based on the Director's interpretation of the Act. Having determined, however, that Marinelli was engaged in maritime employment based on our interpretation of *Schwalb*, we do not reach this alternative argument.

For the same reason, we do not reach ASL's objection to the Director's reliance on *Sanders v. Alabama Dry Dock and Shipbuilding Co.*, BRB Nos. 85–329, 85–329A, 1989 WL 245268 (B.R.B. July 31, 1989).

rather than ASL—controlled his activities. The ALJ rejected this contention:

> [T]hat [Marinelli's] job duties may be under the control of the union has no bearing upon whether he is an "employee" of [ASL] under the Act. Such traditional control consideration [sic] indeed begs the question whether [Marinelli] is an "employee" under the Act, and [ASL's] reliance upon decisions reached in ["borrowed employee" cases] is therefore misplaced. In these cases, the issue was which of several entities was the employer responsible for benefits, and not, as here, whether [Marinelli] was an "employee" under the Act.[6]

This reasoning also does not address the issue. Once it was determined that Marinelli was an employee under the Act, the question remained whether ASL or the union was his employer.

## B. The Board's Analysis

As the Board noted in its decision below, it

> has applied three tests to determine whether an employer-employee relationship exists within the meaning of the Act: (1) the relative nature of the work, (2) the right to control details of the work, and (3) ... Restatement (Second) of Agency, Section 220, subsection 2, which encompasses factors set forth in each of the other two tests. The administrative law judge should apply whichever test is best suited to the facts of the particular case. Where the administrative law judge's application of one test is affirmable, the Board need not address

the administrative law judge's application of the other tests.

*Marinelli,* 2000 WL 1133566, at *3.[7] Moreover, because the Board reviews an ALJ's findings of fact to ensure that they are "consistent with the law," *Port Cooper/T. Smith Stevedoring Co., Inc. v. Hunter,* 227 F.3d 285, 287 (5th Cir.2000), the Board may apply one or more of the tests even if the ALJ has not applied them, *see Reilly v. Washington Metro. Area Transit Auth.,* BRB No. 84-391, 1987 WL 107386, at *2 (B.R.B. May 22, 1987) (applying all three tests where ALJ applied no test to reverse ALJ's determination that no employer-employee relationship existed).

The Board surmised (i) that the ALJ considered two factors listed in the Restatement (Second) of Agency: the method of payment of wages and the extent of control over the details of work, and (ii) that the ALJ determined that ASL's payment of Marinelli's wages outweighed any consideration of whether ASL controlled the details of Marinelli's work. *Marinelli,* 2000 WL 1135566, at *3. Noting that it was undisputed that, pursuant to the CBA, ASL paid Marinelli's wages, the Board affirmed the ALJ's determination that ASL was Marinelli's employer. *Id.*

The Board's surmise that the ALJ relied on the "method of payment of wages" factor listed in the Restatement (Second) of Agency § 220(2) is dubious. Section 220(2)(g) concerns "the method of payment, whether by the time or by the job." The ALJ, however, did not focus on whether ASL paid Marinelli by the hour or by

---

6. As explained more fully below, *see infra* section II.D, the "borrowed employee" test has been used to determine which of two entities is a worker's employer for purposes of the Act. Among the numerous factors considered in making this determination, the most important is which entity has the right to control the worker's activities.

7. As explained below, *see infra* section II.D, the Board has also employed a fourth test, the "borrowed employee" test, in situations in which there is a dispute concerning which of several entities was the employee's statutory employer.

the job. Rather, the ALJ based his conclusion that ASL was Marinelli's employer on *the fact* that ASL paid his wages. Furthermore, Section 220(1) defines an employee as "a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's *control or right to control.*" § 220(1) (emphasis added). The various factors listed in Section 220(2)—including the "method of payment" factor—thus are factors that are considered in determining whether the worker is subject to the other's control or right to control. § 220(2). It is thus difficult to square the Board's finding that the ALJ was relying on the "method of payment" factor with the ALJ's claim that the issue of whether ASL *controlled* Marinelli's job duties was irrelevant.[8]

### C. The "Relative Nature of the Work" Test

Despite the aforementioned flaws in the respective analyses of the ALJ and the Board, these analyses correctly downplayed the issue of "which entity, employer or the union, controlled the details of [Marinelli's] work." *Marinelli*, 2000 WL 1133566, at *3. This control factor is not "suited to the facts of th[is] particular

case," *id.*, because it was inherent in Marinelli's position as a shop steward—a position created by agreement between ASL and the union—that neither party exercised control over the details of his work. As the ALJ found, based on substantial evidence, it was Marinelli's job to mediate disputes between ASL and the union, and he sometimes sided with ASL, other times with the union. Marinelli could not have performed this role if he had been under the detailed control of either entity.[9]

■ Hence, in deciding which of the three employer-employee tests generally applied by the Board is "best suited" to the facts of this case, the ALJ quite properly avoided the tests that make the right to control the details of the employee's work an important factor, namely, the "right to control the details of the work" test[10] and the test embodied in Section 220(2) of the Restatement (Second) of Agency.[11] The remaining test the Board has used, namely, the "relative nature of the work" test, accords no weight to this control factor and therefor is the appropriate test to use in this case. In applying the "relative nature of the work" test, a court should

> focus on two distinct areas: the nature of the claimant's work and the relation of that work to the alleged employer's

---

8. We also note the following inconsistency in the Board's analysis of the employer-employee issue: On the one hand, the Board claims that the instant case "does not concern ... whether [Marinelli] is an independent contractor," yet, on the other hand (as noted), the Board contends that the ALJ relied on two factors listed in Restatement (Second) of Agency § 220(2)—factors which courts are to consider when *determining whether a worker is* an independent contractor. *Marinelli*, 2000 WL 1133566, at *3.

9. Marinelli's testimony that he "reported" to union leaders is not to the contrary, because he also testified that no one told him what to do in his job.

10. The "right to control the details of the work" test has four recognized elements: 1) the right to control the details of the work; 2) the method of payment; 3) the furnishing of equipment; and 4) the right to fire. *Herold v. Stevedoring Servs. of Am.*, BRB No. 96–1080, 1997 WL 692211, at * 2 (B.R.B. Oct. 3, 1997).

11. As noted, Section 220 is designed to determine whether the worker is "subject to [an entity's] control or right to control." Restatement (Second) of Agency § 220(1). Section 220(2)(a) concerns "the extent of control which ... the master may exercise over the details of the work." *Id.* § 220(2)(a).

regular business. In evaluating the character of a claimant's work, a court should focus on various factors, including the skill required to do the work, the degree to which the work constitutes a separate calling or enterprise, and the extent to which the work might be expected to carry its own accident burden. In analyzing the relationship of the claimant's work to the employer's business the factors to be examined include, among others, whether the claimant's work is a regular part of the employer's regular work, whether the claimant's work is continuous or intermittent, and whether the duration of claimant's work is sufficient to amount to the hiring of continuing services as distinguished from the contracting for the completion of a particular job.

*Oilfield Safety and Mach. Specialities, Inc. v. Harman Unlimited, Inc.,* 625 F.2d 1248, 1253 (5th Cir.1980).

■ Applying this test to the present case, it is evident that Marinelli's shop steward position did not constitute a calling or enterprise separate from ASL's stevedoring operation. On the contrary, the position existed solely by agreement of ASL and the union. As ASL's owner testified, other non-union stevedoring operations are conducted without the benefit of this position. Nor was Marinelli's position one that could be expected to carry its own accident insurance. Indeed, ASL's owner testified that ASL deducted sums from Marinelli's paychecks for disability benefits. *See also Carle v. Georgetown Builders, Inc.,* BRB No. 83–1618, 1986 WL 66425, at *3 (B.R.B. Nov. 28, 1986) (finding employer-employee relationship because, *inter alia,* claimant did not carry his own accident burden). Turning to the relationship between Marinelli's work and ASL's regular business, we have noted in the preceding section that Marinelli's shop

steward duties were a regular part of ASL's regular stevedoring work. Marinelli held the position continuously from 1986 or 1987 until March 16, 1997, a period of time that is sufficient to amount to hiring of continuing services. Furthermore, the fact emphasized by the ALJ, ASL's payment of Marinelli's wages, also supports a finding that ASL was Marinelli's employer. *See Oilfield,* 625 F.2d at 1255 (under "relative nature of the work" test, finding employer-employee relationship because, *inter alia,* entity paid claimant's salary); *Carle,* 1986 WL 66425, at *3 (same). In sum, viewed through the lens of the "relative nature of the work" test, the ALJ's determination that an employer-employee relationship existed between ASL and Marinelli was supported by substantial evidence.

This conclusion is not disturbed by the fact that ASL exercised no control over the details of Marinelli's work. As indicated above, this fact does not count against a finding that ASL was his employer because it was inherent in the very nature of Marinelli's shop steward position—a position created by the CBA—that Marinelli operated independently of both ASL and the union. *See Oilfield,* 625 F.2d at 1256 (stating that entity's lack of control over claimant did not count against finding that entity was claimant's employer because "[t]he nature of [claimant's] job virtually prohibits a supervisor from controlling the details of the work").

ASL contends that application of the "relative nature of the work" test to this case yields the conclusion that the union, not ASL, was Marinelli's employer because Marinelli "was a labor representation [sic], and [ASL] was not in the business of providing labor representation. [ASL] was in the business of loading and unloading ships. The only employer in this case who was in the business of providing labor

representation was [Marinelli's] union." This argument is without merit. Simply applying the conclusory label "labor representation" to Marinelli's work does not alter the actual nature of that work—work that the ALJ and the Board correctly determined to constitute "maritime employment."

### D. The "Borrowed Employee" Test

ASL argues that the ALJ erred because he failed to employ the "borrowed employee" test, and that application of this test yields the conclusion that the union, not ASL, was Marinelli's employer. As the Board noted, the "borrowed employee" test has been used to determine which of two entities is responsible for a worker's disability benefits under the Act. *Marinelli*, 2000 WL 1133566, at *3 n. 4. In applying the test, courts have considered a variety of factors with a view to determining whether the "lending" employer or the "borrowing" employer is the entity responsible for benefits. *See Gaudet v. Exxon Corp.*, 562 F.2d 351, 355 (5th Cir.1977). However, "the question of who has control over the employee and the work he is performing, has been considered the central [factor]." *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1244–45 (5th Cir.1988); *cf. White v. Bethlehem Steel Corp.*, 222 F.3d 146, 149 (4th Cir.2000) ("Ultimately, any particular factor only informs the primary inquiry—whether the borrowing employer has authoritative direction and control over a worker.").

The "borrowed employee" test has been adopted by several of our sister circuits as well as by the Board. *See White*, 222 F.3d at 149; *Peter v. Hess Oil Virgin Islands*

*Corp.*, 903 F.2d 935, 940–43 (3rd Cir.1990); *Gaudet*, 562 F.2d at 356–57; *Fitzgerald v. Stevedoring Servs. of Am.*, BRB No. 00–0724, 2001 WL 94757, at *4 (B.R.B. Jan. 31, 2001) (en banc). *But see West v. Kerr-McGee Corp.*, 765 F.2d 526, 533 (5th Cir. 1985) (Tate, J., concurring in the judgment) (arguing that under plain language of §§ 904 and 905, the doctrine cannot apply where the "lending" employer has secured payment of the Act's benefits to its workers); *Doucet v. Gulf Oil Corp.*, 783 F.2d 518, 522 (5th Cir.1986) ("If the question were open, we might agree with Judge Tate's concurring opinion in *West*."). We have heretofore neither adopted nor rejected this test and find it unnecessary to do so today. Although this test may apply in an appropriate case, it is inapplicable to the circumstances of this case for the same reason that the "right to control the details of the work" test and the Restatement (Second) of Agency test are inapplicable to this case: It emphasizes the control factor.[12]

### III. Causation and Permanent Total Disability

Section 920 of the LHWCA provides in relevant part that "it shall be presumed, in the absence of substantial evidence to the contrary—(a) That a claim comes within the provisions" of the Act. 33 U.S.C. § 920(a). Inherent in this provision is the presumption that an injury is causally related to a worker's employment. *Port Cooper*, 227 F.3d at 287. To invoke this presumption, a claimant must make out a prima facie case of causation by establishing both that he suffered harm, and that workplace conditions or a workplace accident could have caused, aggra-

---

12. Therefore, we need not address the Director's proposed rule that "the payroll employer should be foreclosed from asserting that it is not liable because it had 'lent' the worker to someone else unless it has joined the asserted borrowing employer in the proceeding on the claim" because this rule presupposes application of the "borrowed employee" test.

vated, or accelerated the harm. *Id.* If the claimant thus qualifies for the presumption, the burden shifts to the employer to rebut the presumption with substantial evidence that the alleged harmful workplace condition did not cause, contribute to or aggravate the claimant's condition. *Id.* at 288. Finally, if the employer offers evidence sufficient to rebut the presumption, then all relevant evidence must be weighed to determine if a causal relationship has been established, with claimant bearing the ultimate burden of persuasion. *Id.*

After finding that Marinelli had established a prima facie case of causation and that ASL had rebutted this case, the ALJ proceeded to step three and concluded that Marinelli was "unable and disabled from performance of [his] job." The ALJ based this conclusion on findings that (i) Marinelli "suffered angina due to . . . job stress on March 16, 19[9]7," (ii) "a return to [his] job would subject him to continued aggravation of his underlying heart impairment by exposure to conditions likely to cause insufficient blood flow to his heart," and (iii) Marinelli had a well-founded fear that "further performance of his job would result in psychological (depression/anxiety) and physical (coronary damage) consequences of intolerable dimension." The Board concluded that these findings were supported by substantial evidence and affirmed the ALJ's award of permanent total disability benefits. *Marinelli*, 2000 WL 1133566, at *6–*7.

■ On appeal, ASL raises four challenges to this conclusion. First, ASL contends that the ALJ "failed to make findings of fact as to exactly what the March 16, 1997 injury was." The record belies this contention. As noted, the ALJ explicitly found that Marinelli "suffered angina due to the job stress on March 16, 19[9]7." The ALJ based this finding on a statement

to this effect in the medical report of Marinelli's treating physician, Dr. Konka.

Second, ASL, citing *Director v. Newport News Shipbuilding & Dry Dock Co., (Carmines)*, 138 F.3d 134, 140 (4th Cir.1998), argues that Dr. Konka's medical report "is not substantial evidence" because it is "an unexplained conclusory opinion, not stated with a reasonable degree of medical certainty." This argument is without substance. *Carmines* states that "[t]he ALJ may not merely credulously accept the assertions of the parties or their representatives, but must examine the logic of their conclusions and evaluate the evidence upon which their conclusions are based." *Id.* Here, the ALJ did more than merely credulously accept Dr. Konka's report. The ALJ noted that Dr. Konka was Marinelli's treating cardiac surgeon, that he had performed several coronary procedures on Marinelli, and that he was intimately familiar with Marinelli's cardiac state.

Third, ASL contends that the ALJ's stated reason for disregarding the testimony of ASL's expert, Dr. Israel, that Marinelli did not suffer an angina attack on March 16, 1997, was based on an erroneous reading of the record. The ALJ found that "Dr. Israel's basis for concluding that the March 16, 1997 pain was non-anginal (i.e., the catheterization results of March 16, 19[9]7 indicating 'not enough coronary blockage to cause chest pain') lacks full creditability [sic] since he fails to indicate exactly what degree of blockage may result in angina." ASL claims that Dr. Israel provided this information because, in his written report submitted to the ALJ, he stated that the catheterization "showed no areas of myocardium at risk (no stenosis greater than or equal to 50%)." This objection is unpersuasive. The ALJ cannot fairly be faulted for failing to interpret Dr. Israel's statement that 50% or greater narrowing of cardiac passages is needed for

there to be "myocardium risk" to mean that 50% or greater blockage is the minimum needed for angina. Moreover, assuming *arguendo* that the ALJ had erroneously disregarded Dr. Israel's statement about the 50% blockage standard, the error was harmless because the ALJ discounted Dr. Israel's opinion that Marinelli did not suffer an angina attack on March 16, 1997 for several other reasons—not the least of which was that this opinion was inconsistent with the opinion of Dr. Konka, who, according to the ALJ, "performed the catheterization and was thus in a much better position than Dr. Israel to interpret the results thereof in terms of degree of blockage." Indeed, as Marinelli points out, the page of *Carmines* cited by ASL actually undermines ASL's argument, because it states that "the testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence if it is totally contradicted by other evidence in the record." *Carmines*, 139 F.3d at 140 n. 5 (internal quotation marks omitted).[13]

Finally, ASL objects that the ALJ never addressed Dr. Israel's contention that, even assuming that Marinelli had an angina attack on March 16, 1997, there was no permanent disability resulting from it because "it is a temporary condition which resolves." The ALJ implicitly rejected this contention by relying on Dr. Konka's contrary finding that Marinelli was "permanently disabled."

## CONCLUSION

We have carefully considered ASL's remaining arguments and find them to be without merit. For the reasons discussed,

13. ASL's related objection that the ALJ ignored the opinion of another non-treating physician, Dr. Seldon, in which he agreed

the Board's affirmance of the ALJ's decisions is affirmed.

with Dr. Israel's opinion, thus fails for these same reasons.