PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MELVIN SIDWELL,

*Petitioner,*

v.

VIRGINIA INTERNATIONAL TERMINALS, INC.; DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR,

*Respondents.*

No. 03-1966

On Petition for Review of an Order of the
Benefits Review Board.
(02-0694)

Argued: February 25, 2004

Decided: June 7, 2004

Before WIDENER and DUNCAN, Circuit Judges,
and William D. QUARLES, Jr., United States District Judge
for the District of Maryland, sitting by designation.

Vacated and remanded by published opinion. Judge Duncan wrote the opinion, in which Judge Widener and Judge Quarles joined.

## COUNSEL

**ARGUED:** Gregory Edward Camden, MONTAGNA, BREIT, KLEIN & CAMDEN, L.L.P., Norfolk, Virginia, for Petitioner. Richard John Barrett, VANDEVENTER BLACK, L.L.P., Norfolk, Virginia, for Respondents.

**OPINION**

DUNCAN, Circuit Judge:

Melvin Sidwell petitions for review of the Decision and Order of the Benefits Review Board ("BRB") denying his claim for permanent partial disability benefits under the Longshore and Harbor Workers' Compensation Act, *as amended*, 33 U.S.C.A. §§ 901-50 (West 2001) ("LHWCA"). Sidwell, who became president of Local 1970 of the International Longshoremen's Association ("Local 1970") after leaving his former employer, Virginia International Terminals, Inc. ("VIT"), alleged in his application for benefits that he suffered a noise-induced hearing loss while employed as a container repair mechanic by VIT. The administrative law judge ("ALJ") reviewing Sidwell's claim found his subsequent employment as president of Local 1970 constituted maritime employment that exposed him to injurious stimuli, and that Local 1970 was therefore responsible for Sidwell's injury, rather than VIT. The BRB affirmed that decision. Because we conclude the ALJ and BRB erred in finding that Sidwell's responsibilities with Local 1970 constituted maritime employment, we grant Sidwell's petition for review, vacate the BRB's final decision and order, and remand.

I.

In 2000, a doctor diagnosed Sidwell with a noise-induced hearing loss. At the time of the diagnosis, Sidwell was employed as the president of Local 1970, which represented employees involved in maritime cargo operations at various waterfront terminals around the Hampton Roads area of Chesapeake Bay in Virginia.[1] Although Sidwell generally discharged his duties as president from his home, in order to address specific issues or grievances he would appear from time to time at one or more of the waterfront terminals where Local 1970's members worked.[2] As a result of these visits, Sidwell spent

---

[1]As president, Sidwell was the only full-time employee of Local 1970.

[2]Sidwell characterized these issues as "[v]arious problems with pay, productivity, [and] overtime rotations," such as "who's next in line to get overtime hours," or "who worked last, who's up for rotation, who's up for shift rotation." J.A. 26. However, these did not include the possibility of a work stoppage.

approximately one hour per week at locations where longshoring activity was taking place. The remainder of Sidwell's work-week was devoted to representing Local 1970 on supervisory committees of the Hampton Roads Port Authority away from the waterfront terminals.

Prior to becoming a full-time employee of Local 1970 in 1996, Sidwell's primary employment was with VIT as a container repair mechanic.[3] At VIT, Sidwell inspected the shipping containers off-loaded from cargo vessels and the trailers on which they were placed for transportation by truck before they left the terminal. The inspections were performed in VIT's "roadability lanes," where employees conducted any necessary cleaning, structural repairs, and maintenance on the containers and trailers as they entered or left the marine terminal. In discharging these duties, Sidwell routinely used air-powered pressure-washers, chippers, grinders, and tire changers. It is undisputed that the operation of these tools as well as other machinery and vehicles in the area contributed to high levels of noise throughout the work-day.

After ending his employment with VIT in order to serve as president of Local 1970 full-time, Sidwell spent much less time at the "roadability lanes" or other areas of the marine terminals around Hampton Roads. Sidwell occasionally visited the waterfront marine terminals in order to resolve issues regarding pay, productivity, shift rotation, and other labor issues. However, Sidwell's primary responsibilities as local president involved maximizing the number of jobs available to his local's membership and resolving questions regarding the scope of the union's jurisdiction. Sidwell also served as the Local's representative on several committees with oversight responsibility over various aspects of the operation of the Hampton Roads waterfront marine terminals.

Following the diagnosis of his noise-induced hearing loss, Sidwell filed a claim under the LHWCA for permanent partial disability benefits that identified VIT as the responsible employer. In opposing Sidwell's claim, VIT attempted to shift liability for Sidwell's disability to Local 1970 through the "last maritime employer rule." Under

---

[3]During his employment with VIT, Sidwell served as president of Local 1970 on a part-time basis.

that rule, the last employer covered by the LHWCA who causes or contributes to an occupational injury is fully liable for compensation benefits. In support of this effort, VIT asserted that the nature of Sidwell's employment as president of Local 1970 demonstrated that Local 1970 was a covered employer under the LHWCA and that Sidwell's time at work sites where Local 1970's membership was employed exacerbated his hearing loss.

Both the ALJ at the hearing and the BRB on appeal concluded that Sidwell's employment with Local 1970 constituted maritime employment and that he was exposed to injurious stimuli in that capacity. Sidwell now petitions this court for review, arguing that the BRB erred in concluding that Sidwell's position as president of Local 1970 constituted maritime employment.

## II.

Our review of the BRB's order is limited. We review the BRB's decision to assess whether substantial evidence supports the factual findings of the ALJ and whether the legal conclusions of the BRB and ALJ are rational and consistent with applicable law. *See Gilchrist v. Newport News Shipbuilding & Dry Dock Co.*, 135 F.3d 915, 918 (4th Cir. 1998); *See v. Wash. Metro. Area Transit Auth.*, 36 F.3d 375, 380 (4th Cir. 1994). While our review of the ALJ's factual findings is thus limited to ascertaining whether the ALJ relied on evidence that a reasonable mind might accept as adequate to support its conclusions, *see See*, 36 F.3d at 380, we review the legal conclusions on which the determination is based *de novo* and without deference to the BRB's interpretation of the LHWCA's provisions, *Gilchrist*, 135 F.3d at 918.

## A.

Sidwell's challenge to the BRB's Decision and Order turns on whether the BRB properly applied the last maritime employer rule. In keeping with the LHWCA's policy "'to encourage the prompt and efficient administration of compensation claims,'" *Newport News Shipbuilding & Dry Dock Co. v. Stilley*, 243 F.3d 179, 181 (4th Cir. 2001) (quoting *Rodriguez v. Compass Shipping Co.*, 451 U.S. 596, 612 (1981)), this court and others have adopted a "last employer" rule in assigning liability for LHWCA claims involving multiple employ-

ers. This rule assigns full liability under the LHWCA to the last maritime employer that exposed the employee to injurious stimuli before the claimant/employee became aware of his injury. *Id.* at 181-82. Because the rule applies only to *maritime* employers, the last employer covered by the LHWCA will always be "fully liable for a claimant's injury even though a subsequent, non-maritime employer also contributed to the injury." *Id.* at 182.[4]

In his petition, Sidwell argues that Local 1970 was not a maritime employer to whom VIT could shift full liability. In response, VIT reiterates its contention that Sidwell's responsibilities as president demonstrate that he is a covered employee under the LHWCA. For purposes of the last maritime employer rule, the terms "covered employer" and "maritime employer" are synonymous. *See Stilley*, 243 F.3d at 182. An employer is covered under the LHWCA if it has "any employee . . . engaged in whole or in part in maritime employment." *See* 33 U.S.C. § 902(4) (2000). Hence, whether Local 1970 is a maritime employer turns on whether Sidwell's position as president, the only full-time position with the Local, constitutes maritime employment.

## B.

Although the term "maritime employment" is not defined by the LHWCA, the Act does provide a non-exclusive list of occupations that meet the criterion. Section 2(3) of the Act defines a covered "employee" as "any longshoreman *or other person engaged in longshoring operations*, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker." 33 U.S.C. § 902(3) (2000) (emphasis added). Although the position of president of a union local is not among the occupations enumerated by the LHWCA as qualifying as maritime employment, VIT argues that the nature of Sidwell's

---

[4]If a covered employer cannot shift liability for a LHWCA disability claim to a subsequent employer under the last maritime employer rule as a threshold matter, the covered employer may nevertheless avoid ultimate liability in a given case by "proving that the employee's disease or injury resulted *exclusively* from exposure during work for another employer." *Stilley*, 243 F.3d at 184 (emphasis added). VIT did not attempt to make such a showing before the ALJ, however.

responsibilities demonstrates that his position constitutes maritime employment under the "other person[s] engaged in longshoring operations" language of § 902(3). The assessment of whether a person's employment qualifies under this category entails "an *occupational* test that focuses on loading and unloading." *P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 80 (1979) (emphasis added). More precisely, only occupations that are "an integral or essential part of loading or unloading a vessel" qualify as maritime employment under the "other persons" category of § 902(3). *See Chesapeake & Ohio Ry. Co. v. Schwalb*, 493 U.S. 40, 47 (1989). The "determinative consideration" in identifying whether an occupation is integral or essential is whether the employee's role is such that "the ship loading process could not continue" absent the employee's participation. *Id.* at 48.

It is undisputed that Sidwell's role as union local president does not require him to engage in the physical activity of loading and unloading vessels. The question then becomes whether Sidwell's duties are such that his occupation can be considered "integral or essential" to the process of loading or unloading vessels so as to bring him within the category of other persons engaged in longshoring operations. First, VIT argues that Sidwell played an occasional but direct role in longshoring operations by resolving disputes involving particular members of his local at the waterfront marine terminals, and that this role was integral to the loading or unloading of sea-going vessels. Second, VIT contends that Sidwell, as the Local's representative on various committees concerning important aspects of the maritime activities conducted in the Hampton Roads port area, played an essential role in the operation of the port and in the longshoring activities conducted therein. We consider each assertion in turn.

1.

We first consider what is arguably Sidwell's most direct involvement in the loading and unloading process: his role in resolving labor issues during the workday. Sidwell described his duties as union president as follows: "I negotiate the working agreement, collective bargaining agreement, under which the men work under, and any and all job disputes. I handle that." J.A. 25. Based on this job description, VIT contends that Sidwell's work "clearly facilitated and was integral to the smooth workings of the waterfront." Appellee's Br. at 19.

In support of the conclusion that Sidwell's union activities are integral or essential to longshoring operations, both VIT and the BRB relied on *American Stevedoring Limited v. Marinelli*, 248 F.3d 54 (2d Cir. 2001). In *Marinelli*, the Second Circuit concluded that the work of a union steward paid by a stevedoring company was integral and essential to the company's longshoring operation. *Id.* at 59-60 & n.4. The shop steward in *Marinelli* worked at the waterfront terminal serving as an arbitrator between the company and union members. Significantly, as an adjunct to his responsibilities for maintaining safety and enforcing its terms, the collective bargaining agreement ("CBA") under which the shop steward worked vested him with authority to unilaterally order a work stoppage. *Id.* at 57.

The distinctions between Sidwell's responsibilities and authority and those of the shop steward in *Marinelli* are significant. For example, Marinelli's job site was located at the waterfront terminal. He was physically present at the piers and involved in the day-to-day operations, mediation, and safety inspections of the waterfront operations. To that end, Marinelli also boarded vessels on a regular basis. Sidwell, by contrast, spent little time at the waterfront terminal. There is no indication in the record that he boarded vessels. He worked out of his home and was called to the pier, at best infrequently, to respond to specific grievances. These facts underscore the significantly greater extent to which Sidwell was removed from the loading and unloading process.

However, we are most persuaded that the BRB erred in relying on *Marinelli* by the difference in the respective authority of Sidwell and the claimant in *Marinelli* to stop work. In assessing whether an employee's occupation is integral or essential, the "determinative consideration," as noted above, is whether "the ship loading process could not continue" without the employee's participation. *Schwalb*, 493 U.S. at 48. This standard makes the capacity to interrupt ongoing longshoring activities paramount. In *Marinelli*, the controlling CBA authorized the claimant to unilaterally order a work stoppage as part of his mandate to enforce the CBA's terms and conditions. *See* 248 F.3d at 57, 60 n.4. That power brings Marinelli squarely within the ambit of *Schwalb*'s "determinative consideration." Sidwell, however, is not vested with corresponding authority by the constitution and by-laws of Local 1970 or the International Longshoremen's Association

("ILA"). Nor did VIT present evidence that Sidwell was authorized to interrupt longshoring operations under any of the CBAs governing the sites where Local 1970's membership worked.

We accept VIT's characterization that Sidwell's union role "clearly facilitated and was integral to the smooth workings of the waterfront." Appellee's Br. at 19. However, we cannot conclude that it "bear[s] an integral relationship to the loading, unloading, building or repairing of a vessel." *Id.* Particularly given the lack of any indication that Sidwell possessed the power to interrupt longshoring operations, or that his absence or failure to discharge his duties would lead to the same result, we find Sidwell's handling of work grievances and intermittent appearances at the terminals are insufficient to demonstrate that the duties of his position as president of Local 1970 are "integral or essential" to longshoring operations for purposes of constituting maritime employment.

2.

Our review of VIT's assertion in the context of the remainder of Sidwell's responsibilities also supports this conclusion. As president, Sidwell represented Local 1970 on fifteen to eighteen joint committees of the Hampton Roads Port Authority and the ILA concerning aspects of the port's operations. These included the port safety committee, the substance abuse committee, the driver's accident review committee, and the productivity committee. Sidwell also negotiated the terms of the CBAs governing the employment of Local 1970's membership throughout the Hampton Roads area. While Sidwell spent approximately one hour of each week at the marine terminals resolving the work grievances discussed above, he devoted roughly sixty-five to seventy hours per week to his committee and negotiating responsibilities.

Despite the importance of the committees on which Sidwell served to the longshoring operations conducted in the Hampton Roads area, we disagree with VIT's contention that it is sufficient, either independently or together with the remainder of his duties, to demonstrate that his position constitutes maritime employment. The oversight powers of the numerous committees on which Sidwell sits undoubtedly affected the longshoring operations conducted in the Hampton

Roads area as a general matter. We cannot conclude, however, that this level of involvement is sufficient to demonstrate that these activities are "integral or essential" to the loading or unloading of vessels within the meaning of the LHWCA. Were Sidwell's committee activities sufficient to demonstrate that an employee was engaged in maritime employment under the LHWCA, it would be difficult to see how other members of these committees would not be covered. The Supreme Court has cautioned against reading "'maritime employment' to extend so far beyond those *actually* involved in moving cargo between ship and land transportation." *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 424 (1985) (emphasis added); *see also Marinelli*, 248 F.3d at 60 ("[T]he relevant question is whether Marinelli's shop steward duties were integral or essential to *ASL*'s stevedoring operations . . . not whether shop steward duties are integral or essential to stevedoring operations *in general*."). The LHWCA requires a direct and immediate role in the loading or unloading process. *See Schwalb*, 493 U.S. at 46-47.

The broad interpretation adopted by the ALJ and the BRB here also conflicts with the purpose of the term "maritime employment." Prior to 1972, the sole criterion for coverage under the LHWCA was whether the injury occurred on the "actual navigable waters of the United States (including any dry dock)." *Dir., Office of Workers' Compensation Programs v. Perini N. River Assocs.*, 459 U.S. 297, 299, 311 (1983) (internal quotations omitted). As a result, coverage under the LHWCA "stopped at the water's edge," meaning workers such as longshoremen literally walked into and out of coverage under the LHWCA during the course of their duties. *Id.* at 317. To rectify this, Congress amended the LHWCA in 1972 to "expand[ ] the 'navigable waters' *situs* to include certain adjoining land areas," *id.* at 299, including "any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel," *id.* at 313-14 (internal quotation marks omitted). With this expansion of the geographic scope of the LHWCA's coverage, Congress found it necessary "to describe affirmatively the class of workers Congress desired to compensate" by clarifying that only those workers in the covered situs that are "engaged in maritime employment" as described in § 902(3) are covered. *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 264 (1977). The LHWCA's "status" requirement of

being engaged in maritime employment thus limits the extended landward coverage of the LHWCA following the 1972 amendments. *Perini*, 459 U.S. at 317-18.

The conclusion that Sidwell's at best indirect and incidental role in the loading and unloading process constitutes maritime employment is at odds with the purpose of the LHWCA's "status" requirement. Congress and the Supreme Court have made it clear that even a limited but direct role in the loading or unloading process will satisfy the "status" requirement. *See, e.g.*, *Schwalb*, 483 U.S. at 47. However, the contributions of the committees on which Sidwell sat were both limited and indirect in their effect on the longshoring operations conducted at the waterfront terminals where Local 1970's membership worked. Broadening the scope of occupations qualifying as maritime employment under the "other person engaged in longshoring operations" category to include individuals with responsibilities that do not at a minimum directly facilitate the loading or unloading process undercuts the limiting function of the "status" requirement.

## III.

Because we find the facts presented to the ALJ do not demonstrate that Sidwell's responsibilities were "integral or essential" to the loading and unloading of cargo vessels, we disagree with the conclusion that his employment by Local 1970 as president constitutes maritime employment under the LHWCA.[5] Accordingly, we grant Sidwell's petition for review, vacate the final Decision and Order of the BRB, and remand this matter for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

---

[5]As an alternative to his challenge regarding the conclusion of the BRB that Local 1970 was a maritime employer, Sidwell also argues in his brief that there was no evidence from which the ALJ could conclude that his employment with Local 1970 exposed him to injurious stimuli. However, because we conclude Local 1970 is not a maritime employer, we do not reach this issue.