**In the Matter of the COMPLAINT OF WEPFER MARINE, INC. FOR EXONERATION FROM OR LIMITATION OF LIABILITY.**

**No. 03–2202 B.**

United States District Court,
W.D. Tennessee,
Western Division.

Nov. 10, 2004.

Derrick S. Kirby, Gary T. Sacks, Goldstein & Price, St. Louis, MO, Louis J. Miller, Apperson Crump & Maxwell, PLC, Memphis, TN, Counsel for Petitioner.

Matthew H. Ammerman, Thomas C. Fitzhugh III, Fitzhugh & Elliott PC, Houston, TX, Counsel for Claimant Liberty Mutual Insurance Company.

John R. Smith, Brown Brasher & Smith, Memphis, TN, Counsel for Claimants Jose and Kimberlee Gonzalez.

## ORDER GRANTING PETITIONER'S MOTION FOR PARTIAL SUMMARY JUDGMENT

BREEN, District Judge.

### INTRODUCTION AND BACKGROUND

The Claimant in this matter, Jose Ramon Gonzalez (the "Claimant"), and his wife, Kimberlee Gonzalez, brought an action in tort against the Petitioner, Wepfer Marine, Inc. ("Wepfer") in the Circuit Court of Shelby County, Tennessee for alleged injuries and other damages arising from an on-the-job accident involving Mr. Gonzalez while he worked as a barge-breaker on a vessel owned by Wepfer. Wepfer filed a petition in this Court claiming the benefit of the Limitation of Liability Act, codified at 46 U.S.C. §§ 181–95, which permits the owner of a vessel to seek exoneration or limitation of "liability for damage or injury, occasioned without the owner's privity or knowledge, to the value of the vessel or the owner's interest in the vessel." *See Lewis v. Lewis & Clark Marine, Inc.,* 531 U.S. 438, 446, 121 S.Ct. 993, 1000, 148 L.Ed.2d 931 (2001). In the instant motion, the Petitioner seeks partial summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, as to all claims of Gonzalez under the Longshore and Harbor Workers' Compensation Act ("LHWCA" or the "Act"), 33 U.S.C. §§ 901–50.

### SUMMARY JUDGMENT STANDARD

■ Rule 56 provides in pertinent part that a

... judgment ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir.1988). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. at 1356. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Moreover, a party may not create sham issues of fact in order to support its position. *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 402 (8th Cir.1995).

### UNDISPUTED FACTS

The following facts are undisputed unless otherwise indicated. On March 13, 2002, Mr. Gonzalez fell from a barge on which he was working and was injured. (Claim of Jose Ramon Gonzalez and Wife, Kimberlee Gonzalez ("Claim") at ¶¶ 7–8) He alleged in his state court complaint that Wepfer was negligent in failing to provide him with safety equipment and fall protection. (Compl. at ¶ 11; Claim at ¶ 10)

Gonzalez testified in his deposition that he worked as a welder/cutter and primarily repaired or scrapped barges at Wepfer's facility on McKellar Lake, a tributary of the Mississippi River near Memphis, Tennessee. (Claim at ¶ 5; Disc. Dep. of Jose Ramon Perez Gonzalez ("Gonzalez Dep.") at 49–52, 115–16, 132–33; Wepfer Marine, Inc.'s Mot. for Partial Summ. J., Ex. D (Corps of Engineers Map No. 58)). He further related that he performed his duties on drydocks and facilities owned by the Petitioner and that Wepfer was responsible for providing safety equipment. (Gonzalez Dep. at 78–79, 82, 95.) According to Gonzalez's testimony, the sole basis for his claim against Wepfer was its alleged failure to provide him a safety harness or fall protection. (Gonzalez Dep. at 240–441.) As a result of his injuries, Gonzalez has received benefits from Claimant Liberty Mutual in accordance with the Act.

### ANALYSIS OF THE PARTIES' ARGUMENTS

The LHWCA "establishes a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death," without regard to fault. *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 96, 114 S.Ct. 2057, 2062, 129 L.Ed.2d 78 (1994); *accord O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 62 (2d Cir.2002) (citing *Howlett*); *Gravatt v. City of New York*, 226 F.3d 108, 115 (2d Cir. 2000), *cert. denied sub nom. Gravatt v. Simpson & Brown, Inc.*, 532 U.S. 957, 121 S.Ct. 1485, 149 L.Ed.2d 373 (2001). Section § 904 of the Act provides that "[e]very employer shall be liable for and shall secure the payment to his employees of the compensation payable under [the Act.]" 33 U.S.C. § 904. The liability of an employer to his employee under § 904 is exclusive. 33 U.S.C. § 905(a); *see also O'Hara*, 294 F.3d at 62 ("The LHWCA

limits employer liability to the provision of scheduled no-fault compensation payments"); *Gravatt*, 226 F.3d at 115 ("The employee is, therefore, barred from suing his employer in tort").

The Petitioner first contends that, based on Gonzalez's deposition statements to the effect that he was its "employee," Wepfer is immune from this suit in tort pursuant to § 905(a). An "employee" under the statute includes "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker." 33 U.S.C. § 902(3). While neither party suggests Gonzalez, as a shipbreaker, was not an "employee" under the Act, the question is whether he was *Wepfer's* employee for purposes of liability. In determining employee status, the court may consider the relative nature of the work or the right to control details thereof. *American Stevedoring Ltd. v. Marinelli*, 248 F.3d 54, 61 (2d Cir.2001). The latter includes considerations of the method of paying the employee for his work, the furnishing of equipment and the right to fire. *Id.* at 62 n. 10.

Wepfer also contends that, even if the Claimant were not its statutory employee, he was a "borrowed servant" such as to draw him into the ambit of the immunity provision. A so-called "borrowed servant" is, as the moniker implies, one who is in the general employ of one employer while at the same time "borrowed" by another employer. *White v. Bethlehem Steel Corp.*, 222 F.3d 146, 149 (4th Cir.2000). The "borrowed servant" doctrine has been applied by some courts to the LHWCA. *See id.*, *American Stevedoring Ltd.*, 248 F.3d at 64 (collecting cases). In deciding whether an employee is a "borrowed servant," the Court is to inquire into whose work is being per-

formed by determining which employer possesses the power and control over the servant's work.

> The authority of the borrowing employer does not have to extend to every incident of an employer-employee relationship; rather, it need only encompass the servant's performance of the particular work in which he is engaged at the time of the accident. When the borrowing employer possesses this authoritative direction and control over a particular act, it in effect becomes the employer.

*White*, 222 F.3d at 149 (internal citations omitted).

In support of its position that Gonzalez was its employee as a matter of law, Wepfer points to Gonzalez's state court complaint and his deposition taken in this case. In his complaint, Gonzalez alleged that, while he was a direct employee of Robinson, Wepfer had a right to control him and other Robinson employees at the time of the incident; controlled, supervised and directed the means by which they did their work; and that he was, based upon an agency relationship between Wepfer and Robinson, the Petitioner's "statutory" employee. (Compl. at ¶¶ 6, 9) In his deposition, Gonzalez testified that he was an employee of Wepfer (Gonzalez Dep. at 47–48, 82); that his employment with Wepfer was his second job in the United States (Gonzalez Dep. at 28–29), that he went to work for Wepfer after leaving his first job (Gonzalez Dep. at 39), that he had filled out an application for employment at Wepfer (Gonzalez Dep. at 42), that Wepfer executives George Leavell and John Wepfer were his bosses at Wepfer and that they had the ability to fire him (Gonzalez Dep. at 43–47), and that the Petitioner had authority as his employer over the safety of his work area (Gonzalez Dep. at 105).

As Wepfer has supported its motion with documentary proof, it is incumbent upon Gonzalez to present some "specific facts showing that there is a genuine issue for trial." The Claimant insists that he was not in fact an employee of Wepfer, but of Robinson. Counsel for the Claimant argues that the deposition statements relied upon by the movant are ambiguous at best and must be considered in light of Gonzalez's limited English and poor health. Specifically, Gonzalez, a quadriplegic with brain damage, suffers from a blood pressure condition that causes severe dizziness. Gonzalez notes that in his deposition he answered in the affirmative when asked if Ricky Robinson hired him. (Gonzalez Dep. at 41) With respect to the testimony referred to by the Petitioner as to his Wepfer application, Gonzalez points to the context of the testimony, to wit:

Q: Who hired you at Wepfer Marine?

A: I filled out an application for Wepfer. And on the third or fourth day I returned to look for work, because they hadn't called me. And Ricky was in the office, and he asked me: Do you want to work now? And I told him, yes. So he gave me some more papers to fill out again. And I started to working that same day.

(Gonzalez Dep. at 42) Furthermore, Gonzalez testified that he worked for Ricky Robinson and was paid by Robinson, that Robinson gave him his paycheck and that Robinson could fire him. (Gonzalez Dep. at 94–95, 97)

Similarly, Ricky Robinson related in his deposition that Gonzalez was an employee of Robinson Maintenance, that he had personally hired the Claimant and that he was responsible for Gonzalez's work assignments. (Deposition of Ricky L. Robinson ("Robinson Dep.") at 27–28) As for Gonzalez's assertion that Wepfer executives could fire him, Robinson clarified that, while only he could fire his own employees, he would have no "more use for" an em-

ployee Wepfer did not for one reason or another want on its premises. (Robinson Dep. at 33, 35–36)

The Claimant's argument is further bolstered by Wepfer's own management, whose testimony follows that of Ricky Robinson. John Wepfer offered testimony that, to his knowledge, the Petitioner did not pay Gonzalez directly on one of its printed checks for work performed. (Dep. of John Wepfer ("Wepfer Dep.") at 13–14) In response to the following inquiry, "To your knowledge, was anyone at Wepfer Marine directed to oversee the work that was being performed by Robinson Maintenance on Wepfer Marine's property," Wepfer responded, "Not on any particular basis." (Wepfer Dep. 19–20) The company executive further denied ever personally terminating any employee of Robinson, asking "How can we terminate someone who's not employed by us, I guess, would be my question." (Wepfer Dep. 22–23)

In addition, Wepfer manager James Larry Barber made the following statements in his deposition:

Q: ... If Robinson Maintenance is to repair a vessel, to what extent does Wepfer Marine participate in the work, repair and maintenance of a vessel for the Coast Guard or an outside customer?

A: In the actual work?

Q: Yes, sir.

A: None.

Q: Okay. And who decides how the repair and maintenance of vehicles is going to be carried out?

A: Ricky Robinson.

\* \* \* \* \* \*

Q: Are there Wepfer employees—direct employees of Wepfer who are also engaged in the repair and maintenance of vessels alongside Robinson Maintenance and its direct employees?

A: No.

(Dep. of James Larry Barber, Jr. ("Barber Dep.") at 47)

Finally, in his April 10, 2002 letter to Gonzalez's counsel, Wepfer vice president George Leavell clearly stated that "Mr. Gonzalez is employed by Robinson Maintenance, Inc." (Liberty Mut. Ins. Co., Jose Gonzalez and Kimberlee Gonzalez' Joint Resp. to Wepfer Marine's Mot. for Partial Summ. J., Ex. E)

■ Viewing the evidence in the light most favorable to Gonzalez, the Court cannot find Wepfer entitled to summary judgment on the grounds that Gonzalez was, as a matter of law, its "employee" or "borrowed servant" for purposes of the LHWCA. Indeed, the evidence, particularly the testimony and communications of the Petitioner's own employees, indicates the opposite is true. Gonzalez was paid for his work by Robinson. Although it may have been able to exclude the Claimant from the premises, Wepfer did not have the ability to fire him, and the subcontractor was responsible for directing Gonzalez's work and the method by which it was performed.

■ The Court now turns to Wepfer's alternative argument, that is, if Gonzalez were not its employee or borrowed servant, the Petitioner had no legal duty to provide him with safety equipment. In response, Gonzalez argues that Wepfer, as owner of the facility at which the injury occurred, owed to the employees of Robinson, including Gonzalez, a "safe place to work." While an employee is limited to compensation payments from his *employer*, he is permitted under the Act to also sue a *third party* for negligence. *See* 33 U.S.C. §§ 905(b)[1] & 933(a)[2]; *see also*

---

1. Section 905(b) provides in pertinent part that "[i]n the event of injury to a person

*O'Hara,* 294 F.3d at 62 ("the LHWCA authorizes maritime workers ... to recover for negligence, but only against parties *other than* their employers").

The LHWCA [places] primary responsibility for the safety of longshore workers on the shoulders of their employers, the stevedores. [The Act] requires the stevedore, as the longshore worker's employer, to provide a "reasonably safe" place to work and to take the safeguards necessary to avoid injuries. The Act ... grants an injured longshore worker primary recovery against his stevedore employer, and limits the liability that may be imposed against the vessel. [The Congressional purpose of the Act's provisions was based upon] its observation that stevedores are in the best position to prevent injuries to longshore workers.

*McCourt v. Mitsui O.S.K. Lines Am., Inc.,* 921 F.Supp. 1315, 1317 (D.N.J.1996). The LHWCA "reject[s] the notion of a nondelegable duty on the shipowner to provide a safe place to work and [does] not undermine the justifiable expectations of the vessel that the stevedore would perform with reasonable competence and see to the safety of [his] operations." *Scindia Steam Navigation Co., Ltd. v. De Los Santos,* 451 U.S. 156, 172, 101 S.Ct. 1614, 1624, 68 L.Ed.2d 1 (1981).

The statute does not define "negligence" for purposes of tort actions against third-party vessel owners. *See Reed v. ULS Corp.,* 178 F.3d 988, 991 (8th Cir.1999), *reh'g and reh'g en banc denied* (July 28, 1999) (the scope of a vessel owner's duty was instead "left to be resolved through the application of accepted principles of tort law and the ordinary process of litigation"). In 1981, the Supreme Court, in *Scindia,* enunciated federal common law standards [3] to be followed by trial courts in deciding cases, such as that at bar, involving a vessel owner, an independent subcontractor, and an injured harbor worker employed by the subcontractor. *Scindia,* 451 U.S. at 165–78, 101 S.Ct. at 1621–27. The Court "establish[ed] duties of care owed by vessel owners to stevedores and their employees, and to other contractors and non-longshoring harbor workers." *O'Hara,* 294 F.3d at 65; *Gravatt,* 226 F.3d at 122 (applying *Scindia* to non-stevedoring harbor workers); *Roach v. M/V Aqua Grace,* 857 F.2d 1575, 1581–82 (11th Cir.1988) (same). Longshoremen are limited to suing under these duties in negligence actions against shipowners unless the owner has affirmatively undertaken additional duties by contract. *Rodriguez v. Bowhead Transp. Co.,* 270 F.3d 1283, 1286 (9th Cir. 2001). As the Court observed in *Scindia,*

covered under this Act caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with [§ 933]." 33 U.S.C. § 905(b). In such actions, it is permissible to sue the owner of the vessel, rather than the vessel itself. *See Howlett,* 512 U.S. at 96, 114 S.Ct. at 2062.

2. Under § 933(a), "[i]f on account of a disability or death for which compensation is payable under [the] Act, the person entitled to such compensation determines that some person other than the employer or a person or persons in his employ is liable in damages, he need not elect whether to receive such com-

pensation or to recover damages against such third person." 33 U.S.C. § 933(a).

3. In amending the LHWCA in 1972, the House Committee determined that third-party negligence actions thereunder would be "developed as a matter of uniform federal maritime law, not by incorporating the tort law of the particular state in which the action arose," as it did not intend "that the [statute] shall be applied differently in different ports depending on the law of the State in which the port may be located ... but that legal questions ... shall be determined as a matter of Federal law." *Gravatt,* 226 F.3d at 118 (quoting H.R.Rep. No. 92–1441, 1972 U.S.C.C.A.N. at 4705).

"absent a contract provision, ... the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within ... operations that are assigned to the stevedore." *Scindia,* 451 U.S. at 172, 101 S.Ct. at 1624. The parties in this case have neither alleged nor pointed to the existence of any provision of a contract between Wepfer and Robinson that would have assigned a general duty to Wepfer. *See Rodriguez,* 270 F.3d at 1288 (in order to have contained a provision adequate to constitute an additional duty, the contract must have obligated the shipowner to supervise the manner in which the stevedore's work was performed.)

The three so-called *"Scindia* duties" have been identified and explained as follows:

First, before turning over the ship or any portion of it to the stevedore, the vessel owner must exercise ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety. As part of this duty, the vessel owner must also warn the stevedore of hidden dangers that could not be discovered through the exercise of reasonable care. This set of obligations is usually referred to as the "turnover duty."

Second, once stevedoring operations have begun, the vessel will be liable if it *actively involves* itself in the cargo operations and negligently injures a longshoreman. A passive vessel owner has no ongoing duty to supervise or inspect the stevedore's work-absent contractual, regulatory or customary obligations[4] to

the contrary. However, even where the vessel does not actively involve itself in the stevedoring operations, it may be liable if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the *active control of the vessel* during the stevedoring operation. Therefore, the vessel must take care to prevent unreasonable hazards in areas of the vessel under its direct control. These related obligations arising either from the vessel's "active involvement" in cargo operations or its "active control" of areas of the vessel encountered by longshoremen are commonly known as the "active control duty."

Third, ... [w]ith respect to obvious dangers in areas under the principal control of the stevedore, the vessel owner must intervene if it acquires actual knowledge that (1) a condition of the vessel or its equipment poses an unreasonable risk of harm and (2) the stevedore is not exercising reasonable care to protect its employees from that risk.

*Gravatt,* 226 F.3d at 120–21 (citing *Scindia* ) (internal citations and quotation marks omitted) (emphasis in original). The last duty is referred to as the "duty to intervene." *Sinagra v. Atlantic Ocean Shipping, Ltd.,* 182 F.Supp.2d 294, 300 (E.D.N.Y.2001).

 However, the mere existence of an unsafe condition is not sufficient to establish liability of a vessel owner. *Treadaway v. Societe Anonyme Louis–Dreyfus,* 894 F.2d 161, 166 (5th Cir.1990), *reh'g denied* (Apr. 3, 1990). An owner does not have an absolute duty to provide longshoremen and harbor workers with a completely safe vessel. *Id.*

---

**4.** The Supreme Court recognized in *Howlett* that "[i]t is settled maritime custom and practice that the stevedore exercises primary con- trol over the details of [the] ... operation." *Howlett,* 512 U.S. at 103, 114 S.Ct. at 2066.

Because Gonzalez has failed to identify the type of *Scindia* duty he deems applicable to this case, the Court will consider each in turn. With respect to the turnover duty, which has been described as a narrow one (*see Howlett*, 512 U.S. at 105, 114 S.Ct. at 2066), the vessel owner "has a duty with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the [shipbreaking] operations; and if he fails at least to warn the [subcontractor] of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman." *Scindia*, 451 U.S. at 167, 101 S.Ct. at 1622. That is, in order to survive summary judgment, Gonzalez must "show that there was a latent defect ... that the shipowner knew or should have known of the defect in the exercise of reasonable care, and that the shipowner breached its duty by failing to discover or warn the [subcontractor] of the defect." *See Lincoln v. Reksten Mgmt.*, 354 F.3d 262, 267 (4th Cir.2003). In the Court's view, the alleged lack of a safety harness or other "fall protection" cannot be considered a "latent" defect,[5] as such a condition would be immediately obvious to an expert and experienced stevedore.

Ricky Robinson stated in his deposition that a tool shed was located on Wepfer's premises containing, among other things, safety harnesses, hard hats, safety glasses, life jackets, and gloves. (Robinson dep. at 31–32) These items were made available to persons who worked on Wepfer's property, including Robinson's employees. (Robinson Dep. at 30, 32, Barber Dep. at 59–60) Robinson further testified that he would have been the person to direct one of his employees to wear a safety device in the event the worker did not do so on his own. (Robinson Dep. at 29–30) No evidence has been presented to indicate that, when the vessel was turned over to Robinson, the toolshed was in some way inaccessible or that the items contained therein were inadequate for the needs of the job in his opinion as a competent stevedore. Nor has the allegation been made that any of the safety equipment available was defective. Thus, the turnover duty was not breached.

As for the "active control duty," the active involvement itself must have constituted negligent behavior. *Sinagra*, 182 F.Supp.2d at 302. However, "the vessel's mere reservation of the right to intervene to protect the ship's and its crew's interests, or to eject the stevedore at any time, does not amount to the substantial control necessary to trigger the vessel's active operations duty as long as the vessel does not exercise those reserved rights." *Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 541 (3d Cir.1994), *reh'g and suggestion for reh'g en banc denied* (Mar. 28, 1994). The only allegation by the Claimant that would implicate the active control duty is a reference to the Petitioner's provision of safety equipment in the toolshed previously discussed and the deposition testimony of John Wepfer and Gonzalez.

With respect to John Wepfer's deposition, the Claimant points out the testimony found at pages 21 and 22, in pertinent part as follows:

Q: Have you inventoried Ricky's shed?

A: No.

Q: Do you know what I'm talking about?

A: I presume I do.

Q: Where he keeps his tools.

---

**5.** "Latent" is defined as "present and capable of becoming though not now visible, obvious, or active." *Merriam–Webster's Collegiate Dictionary* 657 (10th ed.1995).

A: Uh-huh.

Q: Do you know what safety equipment Wepfer provides to its own employees?

A: Whatever's necessary, but I guess, specifically I'm thinking of life jackets, hard hats, flashlights, safety harness, you know, to name a few.

* * * * * *

Q: ... If a Wepfer Marine employee was not using safety equipment that you thought necessary, would you tell him so?

A: Yes.

Q: And if that employee would not use safety equipment that you thought was necessary, could you terminate him?

* * * * * *

A: I could.

Q: ... Could Wepfer Marine require Robinson Maintenance to employ safety devices as a condition precedent to permitting Robinson Maintenance to work on the premises of Wepfer Marine?

A: Well, I think we could require Robinson Maintenance as a vendor on our premises to do anything.

(Wepfer Dep. at 21–22) Whatever benefit the Claimant might appear to glean from a favorable interpretation of this testimony is tempered by that contained on the next page of the deposition, which follows:

Q: Do you know whether Wepfer Marine has ever terminated an employee of Ricky Robinson or Robinson Maintenance?

A: Do I know?

Q: Yes, sir.

A: To my knowledge, no.

Q: Have you participated in any discussions with Ricky Robinson where you recommended that an employee of Robinson Maintenance be terminated?

A: I can't think of any specific instances.

Q: Do you discuss safety issues with Ricky Robinson?

A: Very seldom. Ricky's been doing it a long time. I pretty much leave it to him to establish what the safety procedures are.

(Wepfer Dep. at 23)

This testimony, even viewed in the light most favorable to Gonzalez, cannot support a finding that Wepfer maintained any active control over the use by non-employee longshoremen of the tools in the shed. Indeed, to conclude otherwise would be to punish shipowners for having any safety equipment on board at all. Moreover, even if Wepfer may have had some authority to exclude Robinson or its employees from its premises for infractions, the Petitioner's failure to exercise that authority prohibits a finding of substantial control on that basis. *See Davis,* 16 F.3d at 541.

Gonzalez fares no better in relying on his own testimony. He argues in his response to the instant motion that "numerous times prior to his fall he asked Wepfer personnel to provide him with a safety harness or some sort of fall protection, and that Wepfer Marine, without explanation, never complied with his request"(Liberty Mut. Ins. Co., Jose Gonzalez, and Kimberlee Gonzalez' Joint Resp. to Wepfer Marine's Mot. for Partial Summ. J. at 13). Although he makes reference to his deposition testimony at pages 80 through 90, the testimony offers little to support his assertion, to wit,[6]

---

6. The Claimant has attached to his response only pages 86 through 90. Therefore, only the testimony on those pages will be considered by the Court.

Q: Did you ever ask for a safety belt?

\* \* \* \* \* \*

A: I said before that I have told Ricky and also the person at the desk about wearing something for protection.

\* \* \* \* \* \*

A: I spoke to someone about protection, wearing something for protection, but I didn't specifically say what it was.

Q: And who did you speak with about asking for protection?

A: To Ricky and to the guy that worked behind that desk. Because I saw someone—the reason I asked, because I saw someone, as I said, that slid and fell on the floor, and me, too, I did the same thing, and it bothered me.

Q: And Ricky told you, yes, you're right, you should have some protection?

A: Yeah, you're right, Joe.

Q: Did you follow-up that conversation with Ricky by saying, Okay, if I'm right, get me some protection? Or words to that effect?

A: Well, I thought that Ricky is an intelligent person, and one didn't have to repeat things that he would know that he should do.

\* \* \* \* \* \*

A: Sometimes when [Ricky Robinson] would see that someone was having a problem with slipping, he would say, we really need some protection.

\* \* \* \* \* \*

A: And sometime when something happen to somebody, somebody fall in the floor, grease in the floor and they slide down on the floor, or fall in the water, or whatever, I know many times Ricky say, Yeah, I need something here because somebody is going to get hurt.

(Gonzalez Dep. at 86–90) Gonzalez's testimony concerns instances where workers slipped and fell or his fears of slipping and falling. As the injury alleged here did not result from a slip and fall, it is of no benefit to the Claimant. Even if the Court were willing to extrapolate from the testimony that safety equipment was refused to longshoremen providing work on Wepfer's vessels, it is clear from the testimony of Wepfer and Gonzalez that the Petitioner did not exercise "active control" over the toolshed or the distribution of articles therefrom while the shipbreaking operations were being conducted. A conclusory statement to the effect that Gonzalez addressed a question to a man behind a desk, whose name he could not recall in deposition, is not sufficient to militate a finding to the contrary.

■■■■■ Nor does the evidence presented in this case support a conclusion that Wepfer violated the duty to intervene. As the Court has previously noted, the shipowner does not have a general duty "by way of supervision or inspection" to exercise reasonable care in order to discover dangerous conditions that may occur in the area of the vessel assigned to the stevedore for its operations. *Scindia*, 451 U.S. at 175, 101 S.Ct. at 1626. Rather, the duty is triggered when the owner "(1) know[s] of a hazardous condition; (2) realize[s] or should have realized that the condition presents an unreasonable risk of harm to the longshoremen; (3) know[s] that the stevedore has failed to remedy that situation; and (4) helped to create the hazard." *Quevedo v. Trans–Pacific Shipping, Inc.*, 143 F.3d 1255, 1260 (9th Cir.1998). Violation of the duty requires *actual* knowledge on the part of the vessel owner. The fact that it should have known of the condition is not sufficient to establish liability. *Gravatt*, 226 F.3d at 127 n. 17.

Gonzalez has neither alleged nor presented evidence to suggest Wepfer execu-

tives had actual knowledge of or helped to create any hazardous condition in connection with safety equipment made available to Robinson's employees, and, thus, cannot establish the Petitioner owed him a duty to intervene.

 Based on the Court's determination that Gonzalez has failed to show Wepfer breached a duty to act with respect to the injury claimed, summary judgment on the LHWCA negligence claim is warranted. Even so, the Court deems it appropriate to comment on the Claimant's final argument; that is, that violations of the Occupational Safety and Health Act ("OSHA")[7] committed by Wepfer constitute negligence *per se*, citing *Teal v. E.I. DuPont de Nemours & Co.*, 728 F.2d 799 (6th Cir.1984). In *Teal*, the Sixth Circuit held that an OSHA violation could constitute negligence *per se* if the injured party was a member of a class of persons the statute was intended to protect. *Teal*, 728 F.2d at 804. In *Ellis v. Chase Communications, Inc.*, 63 F.3d 473, 477 (6th Cir. 1995), the Sixth Circuit clarified its earlier holding, noting that *Teal* "does not change the law of this circuit that OSHA does not create a private right of action." Consequently, with the LHWCA claim dismissed, Gonzalez cannot sustain this action based solely on an alleged OSHA violation.[8]

## CONCLUSION

For the reasons set forth herein, the Petitioner's motion is GRANTED. In addition, because the Claimant has raised the question of whether this motion for partial

7. 29 U.S.C. § 651, *et seq.*

8. Even if he were able to do so, such a claim would most likely fail. Although Gonzalez avers there were prior incidents of injuries resulting from falls on Wepfer's vessels, there is no evidence of the cause of those incidents or that they were the result of Wepfer's failure

summary judgment would be, if granted, in fact dispositive of this case in its entirety, the parties are hereby directed to advise the Court, within eleven (11) days of the entry hereof, which claims, if any, remain.

to provide safety harnesses or fall protection under circumstances similar to those at bar. *See Jones v. Toei Shipping*, Civ. A. No. 91–0198, 1991 WL 193415, at *5 (E.D.Pa. Sept.19, 1991) (failure to provide credible evidence that prior incidents had the same cause as that as that before the court was fatal to plaintiff's claim).