BIS SALAMIS, INCORPORATED; Signal Mutual Indemnity Association, Limited, Petitioners

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, United States Department of Labor; Joseph Meeks, Respondents.

No. 15–60148.

United States Court of Appeals, Fifth Circuit.

March 17, 2016.

a different theory." *Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 342 (5th Cir.1999)

(citations omitted).

Thomas J. Smith (argued), Amanda Elizabeth Kurz, Galloway, Johnson, Tompkins, Burr & Smith, Houston, TX, Daniel Patrick Sullivan, Esq., Mouledoux, Bland, Legrand & Brackett, L.L.C., New Orleans, LA, for Petitioners.

MacKenzie Fillow, Rae Ellen James, Associate Solicitor, Mark A. Reinhalter, Counsel, U.S. Department of Labor Office of the Solicitor, Joshua Thomas Gillelan, II, Esq. (argued), Longshore Claimants' National Law Center, Benefits Review Board, Washington, DC, David Duhon, U.S. Department of Labor OWCP/DLHWC, New Orleans, LA, for Respondents.

Before PRADO, OWEN, and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:

BIS Salamis, Inc. ("Salamis") and Signal Mutual Indemnity Association (collectively, "Petitioners") appeal from the final order of the Benefits Review Board (the "Board"), which granted Joseph Meeks ("Meeks" or "Claimant") benefits under the Longshore Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901–950.[1] This case has a lengthy procedural history. Essentially, after two remands, the Board vacated the ALJ's findings in favor of Petitioners, reversed the ALJ's decision, and rendered a decision in favor of Meeks. For the reasons that follow, we REVERSE in part the award of benefits to Meeks and REINSTATE the ALJ's second order, dated June 28, 2013 ("ALJ's June 2013 Order"), except for the portion of that order denying Meeks's dental costs for his loose and later missing tooth; as to

---

1. The respondents in this case include Joseph Meeks and the Director of the Office of Workers' Compensation Programs, but the Office has chosen not to participate in this appeal.

the loose/missing tooth, we AFFIRM the Board's judgment.

## I. Background

In 2009, Meeks worked briefly for Salamis as a sandblaster and painter on offshore rigs. He was involved in an offshore accident during that employment, which the parties agree places his claim within the bounds of the LHWCA. The parties dispute solely the nature and extent of Meeks's injuries and whether the incident during Meeks's employment with Salamis caused any compensable injury to Meeks.

### A. Factual Background

#### 1. The Incident

On April 9, 2010, a short time after beginning work with Salamis, Meeks was being transferred with several other men from an oil rig to a vessel while attached to a personnel platform and basket ("personnel basket" or "basket"). Meeks claims the basket collided with the vessel near the bulwarks and bounced, knocking him and the other men off the platform on which they were standing and nearly throwing him overboard but for the intervention of one of the men. Meeks alleges he hit the deck on his feet, knocking his teeth together, and then hit his shoulder on the railing of the boat, or bulwark, as he fell.[2]

Immediately after the incident, Meeks stated that he was all right. But he avers

that within thirty minutes, he began to feel pain in his lower back, neck, and mouth. He alleged the same during his depositions, and that his mouth was bleeding and the accident knocked some teeth out. The ALJ apparently credited a statement from Meeks's supervisor that Meeks told him shortly after the incident that Meeks had been "hurt before but ... never got anything for it." When asked about this statement during the hearing before the ALJ, Meeks could not recall whether he had uttered it.

#### 2. Emergency Care

Meeks filled out an accident report and was given a neck brace, attached to a spine board, and transported ashore in a helicopter. An ambulance ultimately took Meeks to Terrebonne General Medical Center ("Terrebonne"). The report from the ambulance ride notes Meeks alleged pain to his lower back and neck and also listed injury to his "face and/or neck."

Records from Meeks's brief stay at Terrebonne do not indicate that Meeks reported any damage to his teeth or mouth, except a report to a company representative on April 10 that he thought he might have a loose tooth. The nursing assessment from his arrival at Terrebonne noted Meeks had a normal gait, with purposeful movement, no tenderness or paralysis, and a full range of motion in all his joints. Meeks reported falling and having "lower

---

**2.** The parties disagree about exactly what happened, but agree that some incident caused the basket to collide with the boat. In reports made contemporaneously or soon after the accident by Salamis and Meeks, Meeks reported that as he was being lowered in the personnel basket onto a boat, the "basket hit [the] deck of [the boat] very hard," and he "f[e]ll out of [the] basket," resulting in neck and back pain. To his physical therapists in the weeks following the incident, Meeks described the personnel basket as having "jolted" onto the ship. Meeks later told multiple

health care providers that the basket had fallen 6–10 feet and hit the deck of the vessel. Salamis reported Meeks was "[b]eing lowered in a personnel basket which collided with a boat during high seas," and that Meeks reported neck and back pain. The captain's incident report noted a miscommunication between the crane operator and the deck hand, resulting in "lower[ing] the basket into the cargo rail on port side of vessel and collaps[ing] the basket as a swe[l]l was rolling through."

back and neck pain," according to the records. Reports from a CT scan and other evaluations observed no evidence of fractures or traumatic injuries in Meeks's spine, but the scans detected "extensive degenerative changes" in both his cervical and lumbar spinal regions.

From his emergency stay, Meeks was diagnosed with a back sprain or strain. The report from that night noted "no acute distress" and "no evidence of trauma." Meeks was discharged to Salamis, which put him up in a hotel and brought him to the company physician, Dr. Gidman, on April 13, 2009. Dr. Gidman had also performed pre-employment physicals on Meeks for Salamis.

### 3. Treatment with Dr. Gidman

Dr. Gidman evaluated Meeks based on Meeks's complaints of neck, lower back, and right leg pain and found that while the lower back pain was severe, the neck symptoms were only moderate. Based on the April 10 x-rays and separate x-rays Dr. Gidman ordered, the doctor noted advanced degenerative changes in the cervical and the lumbar spine areas, plus moderate scoliosis in Meeks's lumbar spine. Dr. Gidman found no fractures. Meeks reported to Dr. Gidman that he had not had similar problems in the past and had not seen any doctors, received treatment, or lost work for neck, lower back, or right leg problems. After performing a physical examination on Meeks, Dr. Gidman noted no tenderness to the touch, spasms, scars, scrapes, scratches, bruising or swelling in examining Meeks's spine. He found Meeks had a normal gait and did not detect pain upon having Meeks perform straight-leg raises. Based on these findings, Dr. Gidman prescribed Vicodin for pain, muscle relaxers, and anti-inflammatories, and he instructed home therapies of stretching, soaks, rubdowns, heating pad,

and only light activities at on-shore work. Dr. Gidman released Meeks to light duty on April 13, 2009.

Meeks returned to Dr. Gidman on April 15, 2009, after performing light work in Salamis's office on land, "complaining of stiffness in his neck and lower back" and "of a cramping and a sleep sensation" in his legs. Straight-leg raising tests were again negative for any symptoms of lower back pain. Dr. Gidman prescribed two days of physical therapy, rest during Meeks's previously-scheduled week off, and a follow-up appointment on May 12, 2009. Dr. Gidman released Meeks to regular duty, to follow his time off.

Meeks attended physical therapy on April 16 and 17, 2009, as prescribed. Reports from therapy state that Meeks reported feeling better but still stiff in his neck and back, with sharp pain in his lower back. After Meeks's weeklong break to rest, he returned to performing light duty, and then regular duty work, for Salamis. But Meeks allegedly continued to experience significant pain, so he stopped work and began reporting to Dr. Esses in Houston in May 2009, upon the recommendation of his attorney. In one of the many inconsistencies noted by the ALJ, Meeks admitted during the hearing that, when asked about it at his deposition, Meeks claimed not to remember who referred him to Dr. Esses. Meeks also admitted that on another occasion he had suggested that his daughter referred him to Dr. Esses.

### 4. Treatment with Dr. Um

In May 2009, Meeks visited Dr. Um, a dentist. Although Meeks's complaints of pain following the incident mostly related to his back and neck, he told a company representative who interviewed him in the emergency room on April 10, 2009, that he thought he had a "loose tooth." He

claimed later that his teeth had been jarred together when he collided with the deck of the vessel. Meeks claims his tooth fell out, so he went to see Dr. Um on May 20, 2009. Dr. Um made a partial denture for the missing tooth and capped the others.

### 5. Treatment with Doctors Esses and Dent

Dr. Esses, an orthopedic surgeon and Meeks's treating physician, began seeing Meeks on May 19, 2009. Meeks told Dr. Esses he "was dropped 10 feet in a personnel basket," resulting in neck and lower back pain. In contrast to the examination by Dr. Gidman, Dr. Esses reported a "marked paravertebral spasm" upon examining Meeks's lower back and found limited range of motion in that area. Dr. Esses also recorded that Meeks experienced pain while performing straight-leg raises. Dr. Esses ordered an MRI of the spine, which revealed degenerative changes of stenosis and disc herniation, but no evidence of compression fractures, dislocation, or other traumatic injuries. In June 2009, Dr. Esses prescribed a lumbar epidural steroid injection ("ESI").

Meeks was referred to Dr. Dent for this injection, and received one on July 8, 2009. Meeks complained to Dr. Dent of stiffness in his neck and lower back, weakness in his legs, that he was dragging his right foot by the end of the day, and that his hands and feet tingled. Meeks told Dr. Dent that he was injured when the personnel basket dropped 10 feet and hit the deck, and that Meeks "was on his feet when the impact occurred." Meeks described his pain to Dr. Dent as between an 8 and 10 on a scale of 10, including sharp, dull, burning pain that radiated from his lower back to his legs and feet. Dr. Dent noted Meeks reported "problems with cooking, cleaning, bathing, and dressing"

during this time period. Dr. Dent reported tenderness to the touch along the spine, muscle spasms in the lower back, and pain on attempting to flex the back. Meeks reported pain in the right leg on a straight-leg raising exercise.

Dr. Dent diagnosed Meeks with lumbago, cervical facet syndrome, cervicalgia, cervical neuritis, and lumbar neuritis. He prescribed pain killers, anti-inflammatories, and muscle relaxers, and he further recommended home exercises. Dr. Dent found Meeks was "unable to work," and provided his "medical opinion that the injuries evaluated ... were the direct result of the patient's work-related injury."

Meeks reported relief for only a couple of days. On July 21, 2009, Dr. Esses noted that Meeks claimed continued and intense pain, with reduced range of motion in his lumbar spine and pain on his right side on straight-leg raising. Dr. Esses thus recommended surgery, and Meeks agreed to schedule one. Salamis would not approve the surgery, so Meeks continued to treat every couple of months with Dr. Dent for pain medication and with Dr. Esses for follow-up until September 17, 2010, when Dr. Esses performed the surgery. During these appointments, both Dr. Esses and Dr. Dent documented worsening pain and leg symptoms, including "marked limitation in range of motion" with pain reported on the right side during straight-leg raises. Dr. Dent's records reflect that Meeks denied any illegal drug use in his history and denied the use of tobacco products, although reports to other doctors and Dent's separate notes acknowledge that Meeks smokes one pack of cigarettes each day, and it is undisputed that Meeks once used illegal drugs. Meeks could not explain why he denied past illegal drug use to Dr. Dent and another doctor.

On September 17, 2010, Dr. Esses performed spinal decompression surgery on Meeks's lower back, noting "profound stenosis" at six levels of the lumbar spine. After the surgery, Dr. Esses reported some improvement, with "no pain with straight-leg raising" on October 4, 2010. However, by November 10, 2010, Meeks began complaining of neck pain. Dr. Esses ordered an ESI on the neck, but Meeks continued to report pain; Dr. Esses prescribed physical therapy and in May 2011 noted that Meeks may be a candidate for surgery.

Meanwhile, Dr. Dent continued to treat Meeks for pain resulting from his lower back and neck. On February 15, 2011, Dr. Dent wrote a "Future Medical Needs Letter," in which Dr. Dent opined it was "probable that [Meeks] will have pain to the low back radiating to the legs for the rest of his life secondary to the fact that there was a lengthy delay between the injury and the lumbar spine surgery." Dr. Dent also found that "Mr. Meeks' low back pain complaints are consistent with his objective findings." He recommended continued pain medication. Dr. Dent found Meeks's "neck pain complaints [to be] consistent with his objective findings" and that Meeks should undergo a second ESI to his neck and possibly cervical spine surgery. Dr. Dent opined that Meeks has developed chronic disabling pain and would expect that flare-ups would totally disable Meeks and make it impossible for him to work.

### 6. Depositions vs. Surveillance: Level of Activity

Salamis had Meeks surveilled without his knowledge on June 9 and 10, 2009, July 13, 14, and 15, 2009, and on September 5 and 6, 2009. The activity on the surveillance videos stands in marked contrast to the pain and limited activity levels Meeks reported to his doctors during this same time frame. The videos revealed Meeks walking around his front lawn and driveway, walking to his truck and bending and leaning over to reach into the truck, driving the truck, often bending at the waist to pull weeds and pick up items, kneeling down and pulling weeds for extended periods of time, doing yard work, climbing steps, standing for extended periods of time, squatting, picking up and carrying around a large baby, and dragging trash to the trash bin.

At his depositions in July 2010 and May 2011 and in reports to his doctors during the period of surveillance, Meeks reported that he was in intense pain, that he could not garden or do yard work, that he did not think he could lift anything heavier than a ten-pound bag of ice, specifically that he did not remember carrying his grandchild, and that he mostly spent time in bed. Of course, the videos show him performing many of these activities without evident pain. After Meeks received the videos from Salamis, he and his attorney submitted an errata sheet, changing some of his answers from his May 2011 deposition. Although he refused to admit that he did yard work even during the hearing before the ALJ, Meeks admitted that he submitted the errata sheet in reality because he saw himself doing things on surveillance that he had denied he could do and realized that he had been caught.

### 7. Second Opinions

Meeks was also examined by two doctors who were either approved by Salamis or by defendants in a related third-party tort case involving Meeks. Meeks did not report to Dr. Likover, the doctor approved by Salamis, until seven months after his

surgery.[3] Dr. Likover, an orthopedic surgeon, noted fair progress from the lumbar surgery, some pain on straight-leg raises, and opined that continued conservative treatment of Meeks's neck (without surgery) would not be improper.

Dr. Vanderweide is an orthopedic surgeon who examined Meeks before the spinal surgery. He diagnosed Meeks with, among other things, lumbar stenosis, cervical spondylosis, and degenerative disc disease. He opined that "Meeks sustained an injury to the lumbar spine, consistent with the mechanism as described[,] which resulted in acceleration and aggravation of lumbar stenosis caused by advanced degenerative changes which pre-existed the injury event at issue." He also opined that surgical decompression of the lumbar spine was reasonable. This was based on his examination of the MRI and other medical records up to that point, and on Meeks reporting that he had taken the impact of a collision between the personnel basket and the deck of a boat mostly through his legs on April 10, 2009, winding up on the deck of the boat after the basket was thrown to its side and the other occupants were thrown into him. Dr. Vanderweide reported guarding or spasm in Meeks's lumbar spine, lower back pain, and low range of motion. But he found no pain on straight-leg raises. He found no spasm or guarding, problems with range of

motion, or need for surgery on Meeks's neck.

Dr. Vanderweide evaluated Meeks again following the lumbar spinal surgery, finding the spinal stenosis had been addressed and that remaining symptoms were related to "significant pre-existing multilevel degenerative disc disease." However, Dr. Vanderweide noted credibility problems: he was "unable to explain the significant change in subjective complaints" regarding Meeks's reported neck pain. He noted significant inconsistencies between the initial evaluation, recent assessments by Dr. Esses, and the latest evaluation, and did not recommend cervical spine surgery. Dr. Vanderweide also stated that Meeks "is now certainly addicted to narcotics," having been regularly using MS Contin since December 2009. Finally, Dr. Vanderweide found it "unreasonable to anticipate that [Meeks] will ever be pain free or 'return to normal,'" an expectation Meeks expressed.[4]

## B. Procedural History

### 1. The ALJ's First Order

Meeks filed a claim for disability benefits under the LHWCA in May 2009, which was referred to the ALJ. Salamis claimed that Meeks was able to return to regular duty as of April 15, 2009, when Dr. Gidman released him, and that the company provided all the medical care and benefits to

---

3. Before the ALJ, the parties disputed whether this doctor's opinion could be admitted because of a dispute related to Meeks's failure to report for evaluation to Dr. Likover before his surgery. The ALJ appears to have considered the evidence that Petitioners wished to strike, and the parties do not appeal this issue. Therefore, we will not address it. *See Hughes v. Johnson,* 191 F.3d 607, 613 (5th Cir.1999).

4. Vocational analyses by experts for Meeks and Salamis generally agreed with this im-

pression, finding that Meeks is unlikely to be able to return to the kind of occupations involving heavy labor that he has performed throughout his life. We need not examine this evidence. It would only come into consideration at the third step of the analysis under the LHWCA, and we conclude that Meeks failed to establish a prima facie case of compensable workplace injury at the first step of that analysis. *See Amerada Hess Corp. v. Dir., Office of Worker's Comp. Programs,* 543 F.3d 755, 761 (5th Cir.2008).

which Meeks is entitled. The ALJ held a hearing on June 17, 2011, at which the parties' counsel presented argument and only Meeks testified. After post-trial briefing, the ALJ issued his order and decision ("September 2011 Order").

The September 2011 Order discussed the evidence presented and noted the ALJ's task was to establish whether Meeks had suffered a compensable injury resulting from incidents on the rig, either directly or through aggravation of a preexisting condition. The ALJ noted Meeks's condition would be presumed to be a result of his work absent substantial evidence to the contrary. The ALJ found there was "little doubt that something happened on the rig ... in which employees, including Claimant, were tossed about," and that Meeks suffered dental trauma and his back had "extensive degenerative changes" to its lumbar and cervical spine. The ALJ acknowledged medical opinions in the record that Meeks's symptoms were a result of his work injury, which aggravated a preexisting condition. Yet, he found the medical opinions "were based in large part on the subjective reports and histories provided" by Meeks, and the ALJ found Meeks totally unreliable and not credible.

The ALJ cited Meeks's "demeanor during the hearing" as failing to "create any confidence in the accuracy of his testimony or even his motivation to at least attempt to tell the truth." The ALJ found that the surveillance video contradicted Meeks's previous testimony, that Meeks filed false tax returns, correcting them only to increase his earnings capacity for a lawsuit, and that Meeks frequently misled or withheld information from his doctors and employers. The ALJ credited Meeks's supervisor's statement that Meeks said he had been injured before but never got anything for it and found that "the weight of the objective medical opinion" favored finding the changes to Meeks's back were simply degenerative in nature. Therefore, the ALJ found Meeks had failed to "establish a new injury or aggravation of a preexisting condition," either through his testimony or the medical evidence.

The ALJ likewise found that Meeks's complaints about his teeth were not credible and did not establish an injury, because with broken teeth, there should have been evidence of bruising, swelling, or bleeding. Noting the lack of evidence about such injuries in the reports of the ambulance or the Terrebonne stay, the ALJ rejected this claim. Overall, the ALJ found "the credible evidence of the record insufficient to find that Claimant suffered any new injuries or aggravated any preexisting conditions beyond the transient [back] strain that was initially diagnosed, and required only that medical treatment provided by Employer, and resulted in no loss of wages."

### 2. The Board's First Decision

Meeks appealed to the Board, which reversed the ALJ and remanded for further findings within the LHWCA's framework. The Board found the ALJ's inferences were rational as to Meeks's broken teeth, but remanded for further findings on the work-relatedness of the "loose tooth" Meeks mentioned at the time of the injury, which appeared to have subsequently fallen out. The Board also remanded for further findings regarding Meeks's back and neck injuries, faulting the ALJ for failing to place his findings within the LHWCA's framework or explicitly discuss the presumption in a claimant's favor under Section 920(a) of the LHWCA, 33 U.S.C. § 920(a) ("the presumption" or "Section 20(a) presumption"). The Board expressed concern that the ALJ had shifted the burden onto Meeks to prove the work-relatedness of his injuries.

### 3. ALJ's Second Order, on First Remand

On remand and after further briefing, the ALJ again found that any testimony, findings, or opinions based on Meeks's statements and complaints were entitled to virtually no weight because he found Meeks to be so dishonest and unreliable. The ALJ laid out these findings and his decision in his June 2013 Order. The only facts the ALJ found were established were that Meeks was involved in an incident where he was "tossed about" in a personnel basket, initially reported being fine, but later complained about his back, and commented about never receiving compensation for his injuries before. The only medical information the ALJ found reliable was that Meeks had preexisting spinal conditions and degenerative disk disease, and that as of May 9, 2009, he had two chipped teeth and one missing tooth. The ALJ found no presumption was invoked as to the loose tooth due to Meeks's lack of credibility, and that even if it was invoked, sufficient evidence rebutted it, inferring that any intervening trauma that could have caused the chipped teeth could have caused the loose tooth.

Although the ALJ acknowledged that employers are liable for incidents that aggravate preexisting conditions or cause them to become symptomatic, he found Meeks failed to meet even the preliminary, prima facie burden to establish a compensable harm. The only harm the ALJ found "was the lumbar strain for which [Meeks] was treated and from which he was released to full duty." He found the presumption applied as to the strain, that there was no rebuttal evidence, and that Meeks received all reasonable and necessary medical treatment for the strain and sustained no loss of wages. However, he found no presumption was raised as to any greater injuries. The ALJ found that Meeks had not shown he was disabled by the injury, because of his total lack of credibility and how that affected the medical opinions. The ALJ stated: "[In] more than 15 years as an administrative and criminal law judge, [he] [could] not recall any witness being less credible than Claimant." The ALJ also found that if the presumption *was* raised that Meeks suffered a greater harm to his back and neck, "there was no evidence to rebut it."

### 4. The Board's Second Decision

After a second appeal, the Board again reversed the ALJ, this time rendering judgment in favor of Meeks, in a July 2014 Decision. The Board concluded that Meeks's back and neck injuries invoked the presumption, that Salamis did not rebut the presumption, and that Meeks had met his burden to show entitlement to temporary total disability. The Board found the ALJ's June 2013 Order was not supported by substantial evidence because objective medical evidence in the record established that Meeks required treatment for his injuries and was prevented from going back to his hard-labor job. The Board also awarded Meeks benefits for his missing tooth, finding it irrational and not supported by substantial evidence to speculate that something else may have caused Meeks's tooth to fall out, when there was no record evidence of another incident and Meeks had complained about his tooth on April 10, 2009. Finally, the Board found Meeks had met his preliminary burden to show he could not return to his usual employment as of April 27, 2009, his last day on the job. Therefore, the Board determined that Meeks was entitled to temporary total disability beginning on December 2, 2009, when Dr. Dent began

treating Meeks for pain.[5]

### 5. The ALJ's Third Order and the Board's Final Decision

On second remand, the parties stipulated to Meeks's average weekly wage figure for compensation purposes. The ALJ entered an order awarding temporary total disability compensation from December 2, 2009, to the present and continuing, with provision for Salamis to pay medical costs for past, present, and future treatment. The Board summarily affirmed the ALJ's January 2015 Order, and Salamis timely appealed the Board's final decision ("February 2015 Decision").

## II. Jurisdiction and Standard of Review

■ We have jurisdiction over the final order of the Board under 33 U.S.C. § 921(c). *See generally Newpark Shipbuilding & Repair, Inc. v. Roundtree*, 723 F.2d 399, 401–02, 403–06 (5th Cir.1984) (en banc).[6] In reviewing the Board's final decision, we may also review intermediate orders remanding the case to the ALJ for further proceedings. *See Mijangos v. Avondale Shipyards, Inc.*, 948 F.2d 941, 943–44 (5th Cir.1991).

■ We review the Board's decisions to correct any errors of law and to determine whether the Board "adhered to its proper scope of review." *Ceres Gulf, Inc. v. Dir., Office of Worker's Comp. Programs*, 683 F.3d 225, 228 (5th Cir.2012) (citation omitted). The Board must uphold the ALJ's findings if those findings are rational, supported by substantial evidence, and consistent with the law. *See id.; Mijangos*, 948 F.2d at 944. "Substantial evidence is 'that relevant evidence— more than a scintilla but less than a preponderance—that would cause a reasonable person to accept the fact finding.' " *Ceres Gulf*, 683 F.3d at 228 (quoting *Coastal Prod. Servs., Inc. v. Hudson*, 555 F.3d 426, 430 (5th Cir.2009)). Neither we nor the Board may substitute our judgment for that of the ALJ. *See Ortco Contractors, Inc. v. Charpentier*, 332 F.3d 283, 290 (5th Cir.2003). "The ALJ ... is exclusively entitled to assess both the weight of the evidence and the credibility of witnesses," *Ceres Gulf*, 683 F.3d at 228, and this court may vacate the Board's decision if it improperly fails to accept the ALJ's assessments, *see Ortco*, 332 F.3d at 290.

## III. Discussion

■ Salamis argues the Board erred in overturning the ALJ. Salamis asserts that the ALJ's decision to deny benefits was supported by substantial evidence—including the ALJ's determination that Meeks had no credibility—and that the Board exceeded its authority in making its own fact findings from the record. Salamis requests that this court affirm the first two decisions of the ALJ, which denied Meeks's benefits. Meeks argues, among other things, that he established a prima facie case that he suffered a compensable injury during the course and scope of his

5. Judge Boggs concurred that Meeks had established the presumption, but dissented from rendering judgment, arguing the ALJ should find the facts in the first instance.

6. Salamis attempted to appeal the ALJ's decision before the Board had ruled after the second remand. This court dismissed that appeal for lack of jurisdiction because the Board had not issued its final order. *See BIS Salamis, Inc. v. Dir. & Meeks*, No. 14–60681

(Oct. 21, 2014). The Board issued the order from which Salamis now appeals, noting it had only remanded the case for the ALJ to determine Meeks's average weekly wage and that it summarily affirmed the ALJ's last decision "in order to perfect employer's appeal to the Fifth Circuit." The Board's February 2015 Decision is final and appealable. *See generally Mijangos v. Avondale Shipyards, Inc.*, 948 F.2d 941, 943–44 (5th Cir.1991).

employment with Salamis, triggering the Section 20(a) presumption in his favor, and that the ALJ's rejection of his claim was not supported by substantial evidence. Meeks contends that the assessment of Meeks's credibility does not constitute substantial evidence to support the ALJ's rejection of Meeks's claims, because credibility determinations should not be made in determining whether the presumption has been invoked. Meeks requests affirmance of the final benefits award.

## A. The LHWCA's Framework for Assessing Claims

The LHWCA provides a three-step framework for adjudicating claims for work-related injuries and is to be liberally construed in favor of injured workers. First, this framework contains a presumption in favor of an employee, the Section 20(a) presumption, which essentially presumes that an employee's "claim comes within the provisions" of the LHWCA. 33 U.S.C. § 920(a). We have held that a claimant may invoke the presumption by establishing a prima facie case, which requires the claimant to "prove" that (1) he suffered harm and (2) conditions of the workplace, or an accident at the workplace, could have caused, aggravated, or accelerated the harm. See, e.g., Port Cooper/T. Smith Stevedoring Co. v. Hunter, 227 F.3d 285, 287 (5th Cir.2000); Amerada Hess Corp. v. Dir., Office of Worker's Comp. Programs, 543 F.3d 755, 761 (5th Cir. 2008).

■. If a claimant successfully makes such a prima facie case, the ALJ may presume that the work conditions or incident caused the claimant's harm, unless the employer can rebut the presumption at the second step of the analysis "through facts—not mere speculation—that the harm was *not* work-related." *Amerada Hess*, 543 F.3d at 761 (citation omitted). If the employer presents substantial evidence to rebut the Section 20(a) presumption, it falls out of the case and the ALJ determines whether the work condition or incident caused the employee's injury by weighing all of the evidence. See id. (citing Port Cooper, 227 F.3d at 288). The claimant retains the burden of persuasion at this third and final step of the analysis—if the evidence is evenly balanced, the claimant loses. See Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries, 512 U.S. 267, 280–81, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994).

Meeks argues that this court has incorrectly imposed on claimants a burden of proving a prima facie case, rather than simply alleging a compensable injury, at the first step of the LHWCA analysis. This argument is unavailing. A claimant for benefits under the LHWCA faces a fairly light burden, but our court and other courts have consistently required prima facie proof of a compensable injury. See, e.g., Port Cooper, 227 F.3d at 287 ("In order for [the Section 20(a)] presumption to apply, the claimant must make a *prima facie* showing of causation."); Conoco, 194 F.3d at 690–91 (noting the "presumption of causation" may be invoked by "a prima facie case of workplace injury" (citation omitted)).

■ Additionally, we conclude that an ALJ may make credibility determinations in ascertaining whether a claimant has made a prima facie case. We have approved such credibility determinations in the past. See, e.g., Ramsay Scarlett & Co. v. Dir., Office of Workers' Comp. Programs, 806 F.3d 327, 331 (5th Cir.2015) (upholding an ALJ's finding that a claimant made a prima facie case based partly

on the ALJ's credibility determinations).[7]

### B. The ALJ's Adjudication of Meeks's Claims and the Board's Review

We review the ALJ's findings to determine whether they were supported by substantial evidence in attempting to determine whether the Board properly reviewed the ALJ or committed legal errors. *Ceres Gulf*, 683 F.3d at 228. Consequently, this case turns on whether substantial evidence supported the ALJ's decision to disregard, based on Meeks's lack of credibility, the evidence that might have otherwise established a prima facie case for an aggravation of Meeks's back and neck injuries. *See Mendoza v. Marine Pers. Co.*, 46 F.3d 498, 500 (5th Cir.1995).

#### 1. Meeks's Back and Neck Claims

Under the LHWCA, Meeks first had to make a prima facie case that (1) he suffered harm, and (2) the personnel-basket incident could have caused, aggravated, or accelerated the harm to his back and neck. *See Port Cooper*, 227 F.3d at 287. The aggravation rule provides that when "an employment injury worsens or combines with a preexisting impairment to produce a disability greater than that which would have resulted from the employment injury alone, the entire resulting disability is compensable." *Ortco*, 332 F.3d at 290 (citation omitted); *see also Louis Dreyfus Corp. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 125 F.3d 884, 887 (5th Cir.1997). Multiple doctors opined that the current condition of Meeks's spine, with its preexisting degenerative disorders, is capable of causing Meeks severe pain and keeping him from working in his previous job. The record does not contain evidence that Meeks's back condition was caused directly by the workplace incident. Accordingly, to prevail, Meeks had to make a prima facie showing that his condition could have been aggravated by the incident with the personnel basket or that the symptoms of his condition may have manifested as a result of that incident. *See Ortco*, 332 F.3d at 290–91.

Dr. Vanderweide and Dr. Dent both opined in general terms that Meeks sustained an injury to his lumbar spine, consistent with or as a result of the incident he described at the oil rig, which aggravated or accelerated his pre-existing degenerative condition. Both doctors credited Meeks's complaints of pain about his back in part based on straight-leg raises and other in-person exams they performed, and both doctors diagnosed Meeks with degenerative spinal conditions. The ALJ did not credit this evidence, except to the extent that Meeks had a degenerative, preexisting condition. The ALJ found the doctors' opinions and diagnoses were based on Meeks's own reports of pain and injury, which the ALJ found unreliable based on Meeks's utter lack of credibility. Therefore, the ALJ found Meeks had not shown that the personnel-basket incident could have caused anything more than a strain.

The Board may reject findings that are irrational or unsupported by sub-

7. *See also Gold v. Dir., Office of Worker's Comp. Programs*, 424 Fed.Appx. 274, 277–78 (5th Cir.2011) (rejecting an argument that an ALJ had incorrectly applied the presumption, concluding "[t]he ALJ's determination that [the claimant's] testimony on both prongs of the prima facie case was not credible, and that the credible evidence did not support his allegations, [was] supported by the evidence in the record"); *Turner v. Dir., Office of Worker's Comp. Programs*, 334 Fed.Appx. 693, 696 (5th Cir.2009) (affirming an ALJ's finding of no back injury and no Section 20(a) presumption because the ALJ discredited the testimony of the claimant and his medical experts).

stantial evidence. *See Ceres Gulf*, 683 F.3d at 228; *Mijangos*, 948 F.2d at 944. In this case, the Board relied on the doctors' findings in concluding that the ALJ's denial of benefits was not supported by substantial evidence. The Board reasoned that even if Meeks was not credible, some of this medical evidence was sufficiently objective that the ALJ should have accounted for it. For example, straight-leg raising, flexion, and extension tests suggested a lack of range of motion and the type of pain consistent with the injuries Meeks claimed. Accounting for this evidence, the Board found Meeks made a prima facie case that the incident with the personnel basket could have aggravated or made symptomatic the preexisting condition of his lumbar spine; therefore, the Board found that Meeks invoked the Section 20(a) presumption.

 We disagree. Although this is a difficult case, we conclude that substantial evidence supports the ALJ's determination that Meeks failed to make a prima facie case that the work-related injury could have caused anything more than a transient back strain. An ALJ may accept or reject the conclusions of experts and "is not required to accept the opinion or theory of a medical expert that contradicts the ALJ's findings based on common sense." *Avondale Indus., Inc. v. Dir., Office of Workers' Comp. Programs*, 977 F.2d 186, 189 (5th Cir.1992). The ALJ may choose between reasonable inferences, and the ALJ exclusively determines the weight of the evidence. *Mijangos*, 948 F.2d at 945.

In this case, plentiful evidence demonstrates that Meeks has a degenerative back condition that could reasonably cause the type of pain he alleges. Yet there is no definitive evidence showing Meeks suffered a traumatic injury, and there is no evidence showing a difference in his spine before and after the incident on the personnel basket. The Board determined that it was irrational to disregard the doctors' opinions that the aggravation of Meeks's condition could have been caused by the incident. But these opinions were bare conclusions, unsupported by explanations of how the particular event with the personnel basket might aggravate a preexisting degenerative spinal condition. Apparently, neither Meeks nor Salamis ever deposed the doctors, and they did not testify at the hearing. The record mostly consists of their medical notes and occasionally of short reports containing their conclusions.

Additionally, it is not at all clear that the doctors were assessing the event that actually occurred when they gave conclusory opinions that Meeks's pain was linked to the incident at work. Meeks presented varying descriptions of the incident, testifying at his hearing that the basket "flipped," but telling his doctors that the basket "dropped 10 feet" and hit the deck of the vessel. The ALJ did not have to credit the account Meeks gave to his doctors. No definitive evidence answers whether the event was a small jostling of the personnel basket or a ten foot fall. In the absence of such evidence, we have the ALJ's finding that Meeks was "such an unreliable witness and dishonest individual that his testimony and the opinions and reports of the doctors who relied on what he told them had virtually no probative value or evidentiary weight." "As a result," regarding what occurred on the boat, the ALJ found that "the only relevant facts that are established as more likely than not" include that Meeks "was involved in an incident where he was tossed about in a personnel basket but [initially] reported he was OK when asked." It was not irrational to give the doctors' conclusions little weight, given that they were based on what the ALJ implicitly or explic-

itly found were non-credible descriptions of the incident and complaints of pain.

Although some of the doctors' findings were based on what they viewed as objective tests, it was not irrational to conclude that Meeks probably faked pain and limited range of motion. *See Mendoza*, 46 F.3d at 500–01. Meeks admitted during the hearing that the surveillance videos accurately reflected his abilities. From June through September of 2009, before his surgery, Meeks was able to walk, bend down to pick weeds and pick up his grandchild, drive, climb steps, squat, kneel to pull weeds for an extended period of time, and drag trash to the trash bin, all without evident pain. This account of his life contrasts with the intense pain he reported to his doctors around that time, and his deposition testimony that he mostly spent time in bed and could not clean, do yard work, or lift anything heavier than ten pounds. Meeks's lack of credibility was bolstered by his dodgy testimony and by his failure to accurately report or pay taxes on his income for years, a discrepancy Meeks corrected only after it would serve his interests to report more income. Additionally, the ALJ noted that "[i]n more than 15 years as an administrative and criminal law judge, [he] [could] not recall any witness being less credible than [Meeks]."

Meeks's treating physicians were influenced by his account of events and their role in attempting to treat the pain he reported to them. There is no indication Meeks's doctors viewed the video surveillance evidence or opined on Meeks's abilities based on such objective evidence. Even so, Dr. Vanderweide found Meeks to lack credibility in his complaints of neck pain after his back surgery, noting "worrisome" inconsistencies and that he could not explain Meeks's subjective complaints of pain in light of the objective medical exams.

The Board improperly undervalued the ALJ's credibility determinations, given the lack of completely objective medical evidence supporting Meeks's claim that his degenerative condition suddenly flared up some time after the workplace incident. *Cf. Ortco*, 332 F.3d at 290–91; *Gold v. Dir., Office of Worker's Comp. Programs*, 424 Fed.Appx. 274, 277–78 (5th Cir.2011). Without further explanation of the doctors' conclusions, it was not irrational to conclude that Meeks probably faked enough of his symptoms and pain to undermine the reliability of his doctors' conclusions.[8] Accordingly, the Board erred in overturning the ALJ. The ALJ's determination that Meeks failed to make a prima facie case of workplace-related, debilitating injury was rational and supported by substantial evidence.[9] *See Ortco*, 332 F.3d at 290–91. As we have said before:

> We are neither doctors nor the original fact finders in this matter, and so, under the appropriate standard of review, we need not assess the plausibility of these medical accounts, nor do we assess the

---

8. Indeed, it does not seem irrational, as the ALJ suggested, that Meeks had a pre-existing, degenerative condition that caused him chronic pain, and that Meeks very likely seized on a work incident to obtain free medical care and disability.

9. Because we uphold the ALJ's determination that Meeks failed to prima facie show workplace injury beyond a transient back strain and therefore that Meeks failed to invoke the presumption, we need not reach the rest of the LHWCA analysis. We note that the ALJ found that if Meeks had invoked the presumption, Salamis failed to rebut it, a finding necessary under the second step of the LHWCA framework. *See Ortco*, 332 F.3d at 287, 290. With no rebuttal from Salamis, the analysis would have ended at the second step and resulted in an award of benefits to Meeks. *See id.*

weight they should be accorded relative to other evidence in the record.... Our task is more limited: we ask only whether this evidence was relevant to the ALJ's decision, and whether the ALJ's decision was reasonable based on this evidence.

*Operators & Consulting Servs., Inc. v. Dir., Office of Worker's Comp. Programs,* 170 Fed.Appx. 931, 937 (5th Cir.2006) (citation omitted).

### 2. Meeks's Dental Claim

██ Before the Department of Labor, Meeks's dental claims were reduced to the issue of whether Meeks lost one particular tooth as a result of the work-related incident.[10] No one contests that this claim only involves dental expenses and has not disabled Meeks. We conclude that Meeks should recover the dental expenses associated with the "loose tooth" he reported on April 10, 2009, which had fallen out by the time of his dental appointment with Dr. Um.

The ALJ twice denied this claim after concluding Meeks failed to make a prima facie case because there were no indications that Meeks's mouth was bleeding, that he had any swelling or bruising on his face, or that he reported dental injuries on April 10, 2009. The Board rejected this conclusion, remanding for further findings because the fact that Meeks reported a loose tooth on April 10, 2009, as related to

the jarring of his teeth in the incident, might establish a prima facie case that the same tooth later fell out. On remand, the ALJ concluded no prima facie case had been established, or alternatively that Salamis rebutted any such case, because the ALJ inferred that whatever chipped Meeks's teeth before the appointment likely knocked out the other tooth. The Board found this inference irrational, unsupported by the record, and based solely on speculation. The Board reversed, rendering judgment for Meeks on this claim after concluding that Meeks established a prima facie case that the incident could have caused his loose and missing tooth and that Salamis did not rebut this claim.

The Board did not exceed its authority in rendering judgment for Meeks on his missing tooth. *Ceres Gulf,* 683 F.3d at 228. Substantial evidence supports the conclusion that Meeks established a prima facie case based on his complaint of a loose tooth on April 10, 2009, plus a subsequently missing tooth. Salamis produced no evidence to rebut this claim or to suggest how else Meeks could have lost his tooth. The ALJ's alternate explanation was not supported by substantial evidence in the record.

### IV. Conclusion

"[M]ore than a scintilla" of evidence supports the ALJ's determination that Meeks lacks credibility and that Meeks thus could

---

10. Meeks does not explicitly contest the denial of his claim for the two chipped teeth. Therefore, he has abandoned it before this court. *See Brinkmann v. Dall. Cty. Deputy Sheriff Abner,* 813 F.2d 744, 748 (5th Cir. 1987). To the extent this claim has not been abandoned, the Board did not err in determining that substantial evidence supported the ALJ's rejection of a causal connection between these teeth and the incident. The ALJ inferred that the lack of reports about the chipped teeth or any bruising, bleeding, or mouth injuries on April 10, 2009, belied

claims that the two teeth had chipped due to the incident. The Board found this inference rational and upheld it, remanding only for a determination of whether the "loose tooth" Meeks reported on April 10, 2009, could have subsequently fallen out. The ALJ's inference regarding the chipped teeth is rational and supported by substantial evidence. *See Ceres Gulf,* 683 F.3d at 228. Therefore, to the extent we must reach Meeks's claim for dental expenses related to the two chipped teeth, we find no error in the ALJ or Board's rejecting it..

not prima facie prove that the personnel-basket incident could have aggravated his preexisting condition to the extent he claims. *Id.* We respect the ALJ's prerogative to make these determinations and conclude that the Board erred in reversing the ALJ's rejection of Meeks's back and neck claims. *See, e.g., Gold,* 424 Fed. Appx. at 278–79.

Accordingly, we REVERSE the Board's judgment awarding benefits to Meeks, except as to the Board's conclusion that Meeks was entitled to benefits for his missing tooth, which we AFFIRM. We REINSTATE the ALJ's June 2013 Order, except for that portion which denies Meeks's dental expenses for the missing tooth.[11]

11. We reinstate and affirm the June 2013 Order, rather than the ALJ's September 2011 Order, because it was not an abuse of the Board's authority to remand for more specific findings within the three-step framework of the LHWCA in its first, September 2012 Decision. It is somewhat unclear from the ALJ's September 2011 Order where his findings fell within the burden-shifting framework of an LHWCA claim.